# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3879

_____

| | | |
|---|---|---|
| Joseph Ngure, | * | |
| | * | |
| Petitioner, | * | |
| | * | Petition for Review of an |
| v. | * | Order of the Board of |
| | * | Immigration Appeals. |
| John D. Ashcroft, Attorney General | * | |
| of the United States, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: December 15, 2003

Filed: May 17, 2004

_____

Before MELLOY, BEAM, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Joseph Ngure petitions for review of the decision of the Board of Immigration Appeals ("BIA") denying his claims for asylum, withholding of removal, and relief under the Convention Against Torture. We hold that the determination whether the BIA properly employed its streamlined "affirmance without opinion" procedure with respect to Ngure's claims is committed to agency discretion by law. Reviewing the decision of the immigration judge ("IJ"), which was affirmed without opinion by the BIA, we conclude that this court lacks jurisdiction to review the IJ's determination

that Ngure's application for asylum was untimely.  As to those claims over which we have jurisdiction, we deny the petition for review.

I.

On August 30, 1995, Joseph Ngure, a native and citizen of Kenya, entered the United States as a nonimmigrant student to attend Principia College in Elsah, Illinois. The terms of his J-1 visa permitted him to stay in the United States until June 15, 1996.  On January 25, 2000, the INS issued a Notice to Appear charging that Ngure was removable for failing to maintain his nonimmigrant status.  Ngure admitted that he was removable, and on May 17, 2000, he applied for asylum, withholding of removal under 8 U.S.C. § 1231(b)(3), and relief under the Convention Against Torture.

Ngure is a member of the Kikuyu tribe, which is the largest tribe in Kenya. While Ngure was a student at the University of Nairobi in 1987, he participated in a week-long pro-democracy demonstration protesting, among other things, the detention of various political prisoners and the marginalization of tribes such as the Kikuyu.  Due to violence that erupted at the demonstration, the university closed.  At that time, Ngure was arrested while he was in his room.  Soon after he arrived at the police station, he secured his release because he knew the superintendent of police. Ngure claims that his friend Charles Kirigua was arrested and tortured for his involvement in the demonstration, but Mr. Kirigua actually told Ngure that he was injured during a robbery.

Again, in 1990, Ngure participated in a pro-democracy demonstration that became riotous, and government forces arrested hundreds of participants, including Ngure.  When he was arrested, he was hit with batons and truncheons.  He was detained at a police station for one week, during which time he was interrogated, "roughed up," and subjected to cold and crowded conditions.  The interrogations

-2-

focused on whether he was affiliated with any dissident Kenyan groups. Ngure told the officials that while he was not a member of the groups, he sympathized with their causes. The following week Ngure was questioned in more "tranquil" settings at the Directorate of Intelligence. He was then returned to the police station for another week, at which time Ngure's brother-in-law bailed him out of jail, and the government dropped the charges against him.

Ngure is a follower of the Christian Science faith. In 1993, his Christian Science group met in the park, but police officials advised them that they needed to have a permit to meet in the park and ordered them to disperse. The police took names, but none of the meeting attendees were harmed or arrested.

When Ngure was working in Nairobi in 1994, he was arrested as he passed by a demonstration-turned-riot at a park. He was charged with participating in illegal demonstrations, and was released the next morning on a recognizance bond. The bond required Ngure to report to the police station on a monthly basis until the riots were resolved.

After Ngure left Kenya for the United States in 1995, the Kenyan police went to the home of Ngure's family because he failed to report as scheduled pursuant to the bond. When Ngure was not found, an arrest warrant was issued on February 5, 1996, commanding the arrest of Ngure and ordering him to be brought before the court to answer the charge that he "participated in illegal demonstrations at Uhuru Park's Freedom Corner and defaulting on his own recognizance to appear."

In November 2000, an IJ conducted an evidentiary hearing concerning Ngure's removal from the United States. The IJ concluded that Ngure was ineligible for asylum because he did not file his application within one year of arriving in the United States and did not demonstrate any "changed" or "extraordinary circumstances" that caused his failure to apply within that time period. *See* 8 U.S.C.

§ 1158(a)(2)(B) & (D). Alternatively, the IJ found that although Ngure's testimony was credible, he did not suffer past persecution or have a well-founded fear of future persecution on account of his membership in the Kikuyu tribe, political opinions, or religious beliefs. Based on the same evidence, the IJ denied his requests for withholding of removal and relief under the Convention Against Torture. The BIA subsequently affirmed the IJ's decision without opinion, pursuant to 8 C.F.R. § 3.1(e)(4) (2003).[1] Pursuant to agency regulations, the IJ's decision became the final agency determination. 8 C.F.R. § 3.1(e)(4)(ii).

## II.

Prior to 1999, a panel of three BIA members reviewed the decisions of immigration judges. After concluding that the rapidly growing caseload of the Board of Immigration Appeals was impeding its ability to provide fair, timely, and uniform adjudications, Attorney General Reno instituted the BIA's affirmance without opinion ("AWO") procedure in 1999. Executive Office for Immigration Review; Board of Immigration Appeals: Streamlining, 64 Fed. Reg. 56,135 (Oct. 18, 1999). Attorney General Ashcroft amended the AWO regulations in 2002 in an effort to strengthen and enhance the review process. Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 Fed. Reg. 54,878 (Aug. 26, 2002).

---

[1]We refer throughout the text to the 2003 Code of Federal Regulations, which includes the provisions in effect at the time of the BIA's action in this case. Since the BIA's order in Ngure's case, the streamlining regulations have been recodified at 8 C.F.R. § 1003.1(e)(4); *see* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824, 9830 (Feb. 28, 2003). The affirmance without opinion procedure also appears at 8 C.F.R. § 1003.1(a)(7).

The streamlining regulations provide that a single board member shall "affirm without opinion" an IJ's decision in certain circumstances. The BIA member is required to employ the AWO procedure if the member finds that the result reached by the IJ was correct, that any errors by the IJ were harmless or nonmaterial, and that either "the issues on appeal are squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation" or "the factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion in the case." 8 C.F.R. § 3.1(e)(4)(i). The decision to affirm without opinion does not necessarily approve the reasoning of the IJ, but it does signify that the BIA agrees that the result was correct because any errors were harmless or nonmaterial. 8 C.F.R. § 3.1(e)(4)(ii). Once the BIA affirms a decision without opinion, the IJ's decision becomes the final agency determination. *Id.*; *Palomino v. Ashcroft*, 354 F.3d 942, 943 (8th Cir. 2004).

Our court, like every court of appeals to consider the question, has held that the AWO procedure comports with the Due Process Clause of the Fifth Amendment. *Loulou v. Ashcroft*, 354 F.3d 706, 708-09 (8th Cir. 2003), *amended by*, No. 02-3004, slip op. (8th Cir. April 28, 2004); *Belbruno v. Ashcroft*, 362 F.3d 272, 282-83 (4th Cir. 2004); *Yuk v. Ashcroft*, 355 F.3d 1222, 1229-32 (10th Cir. 2004); *Dia v. Ashcroft*, 353 F.3d 228, 238-45 (3d Cir. 2003) (en banc); *Georgis v. Ashcroft*, 328 F.3d 962, 967 (7th Cir. 2003); *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1288-89 (11th Cir. 2003); *Albathani v. INS*, 318 F.3d 365, 377 (1st Cir. 2003). In *Loulou*, we explained that an alien has no constitutional or statutory right to an administrative appeal from the decision of an IJ. 354 F.3d at 708. Any such right, we observed, is created by regulations issued by the Attorney General, and the current regulations do not entitle an alien to a full opinion by the BIA. *Id.* As a matter of constitutional law, the alien is entitled only to a reasoned decision from the *agency*, not from a particular component of the agency. *Yuk*, 355 F.3d at 1230; *Dia*, 353 F.3d at 241; *Albathani,* 318 F.3d at 377. We concluded in *Loulou* that streamlined review did not compromise our ability to review the decision of the Attorney General, because we

can review directly the decision of the IJ. 354 F.3d at 708. Accordingly, we rejected the constitutional challenge to the AWO procedure. *Id.* at 708-09.

Ngure raises a nonconstitutional challenge to the use of the streamlining procedure in his case.[2] He argues that the BIA's decision to affirm without opinion does not comply with the governing regulations, and that this court should remand the case to the BIA for issuance of a written opinion by a three-member panel. The government implicitly concedes that as a general matter, the Justice Department's failure to follow its own regulations can be challenged under the Administrative Procedure Act ("APA"). *See Webster v. Doe*, 486 U.S. 592, 602 n.7 (1988); *Vitarelli v. Seaton*, 359 U.S. 535, 539-40 (1959); *Service v. Dulles*, 354 U.S. 363, 372 (1957). The government contends, however, that the decision to employ the AWO procedure in a given case is "committed to agency discretion by law," within the meaning of the APA, 5 U.S.C. § 701(a)(2), and that we have no jurisdiction to review it. Our jurisdiction, under that view, is limited to reviewing the decision of the IJ, which constitutes the final determination by the agency.[3]

---

[2]At oral argument, Ngure's counsel argued that an affirmance without opinion in his case violated the Due Process Clause. Counsel acknowledged, however, that the argument was not "well developed" in Ngure's brief and that it was present only in "nascent" form. In fact, Ngure's brief contained only two references to the words "due process," and they appeared in the midst of sections of Ngure's brief that clearly argued different points. These references are not sufficient to support the constitutional challenge presented at oral argument, *see Navarijo-Barrios v. Ashcroft*, 322 F.3d 561, 564 n.1 (8th Cir. 2003), and we will not consider a claim raised for the first time at oral argument. *United States v. Mitchell*, 31 F.3d 628, 633 n.3 (8th Cir. 1994). Accordingly, we conclude that Ngure waived any constitutional challenge to the use of AWO in his case.

[3]We have not previously decided this question. Two of our cases, in summary fashion, have stated that the use of the AWO process in a particular case was proper. *Al Tawm v. Ashcroft*, 363 F.3d 740, 744 (8th Cir. 2004); *Martinez Ortiz v. Ashcroft*, 361 F.3d 480, 481-82 (8th Cir. 2004). Whether the streamlining decision was subject

There is a "basic presumption of judicial review" of agency action. *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993) (internal quotations omitted). "This is 'just' a presumption, however," and in certain instances, agency action is deemed committed to agency discretion by law, and thus unreviewable by the courts. *Id.* at 190-91. Over the years, the Supreme Court has held that judicial review is precluded for certain administrative decisions that are "traditionally left to agency discretion," *id.* at 191, under what has been described as "the 'common law' of judicial review of agency action." *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). These discretionary actions include such matters as whether to institute an enforcement action, *id.* at 837-38, how to allocate funds from a lump-sum appropriation, *Lincoln*, 508 U.S. at 192-93, and whether to grant reconsideration of an action because of material error. *ICC v. Bhd. of Locomotive Engineers*, 482 U.S. 270, 282 (1987).

The Supreme Court typically has held that actions are committed to agency discretion where it is not possible to devise an adequate standard of review for an agency action, *id.*, such as where the relevant statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830; *see also United States v. Juvenile Male J.A.J.*, 134 F.3d 905, 907 (8th Cir. 1998); *North Dakota ex rel. Bd. of Univ. and Sch. Lands v. Yeutter*, 914 F.2d 1031, 1034-35 (8th Cir. 1990). Courts often ask whether there is sufficient "law to apply" in reviewing the agency's action. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413 (1971). An important factor in discerning whether there is a "meaningful standard" for judicial review is whether the agency decision "involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Chaney*, 470 U.S. at 831. In that situation, "[t]he agency is far better equipped than the courts to deal with the many variables involved

_____

to judicial review was not discussed in either case, however, and those decisions cannot be read as having decided the jurisdictional issue. *Jones v. U.S. Bureau of Prisons*, 903 F.2d 1178, 1182 (8th Cir. 1990).

in the proper ordering of its priorities." *Id.* at 831-32; *see also Lincoln*, 508 U.S. at 193.

There is no statute that requires the BIA to issue a written opinion in any particular case, and Ngure does not contend that a statute provides the requisite "law to apply." As noted, however, the judiciary may in certain contexts review an agency's compliance with its own regulations when the regulations impose binding norms on the agency. *Vitarelli*, 359 U.S. at 539-40; *Dulles*, 354 U.S. at 372. "As a general rule, an agency pronouncement is transformed into a binding norm if so intended by the agency[,] and agency intent, in turn, is ascertained by an examination of the statement's language, the context, and any available extrinsic evidence." *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987) (internal quotations and citations omitted). We consider the "language and context" of agency regulations to determine whether they were "intended to bind" the agency's discretion. *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1028 (8th Cir. 2003). The Supreme Court has conducted judicial review, for example, where agency rules were "intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion," *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 538-39 (1970) (citing *Vitarelli*, 359 U.S. 535), or where a rule required the agency to exercise independent discretion, but it failed to do so. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). On the other hand, where a procedural rule is designed primarily to benefit the agency in carrying out its functions, judicial review may be circumscribed. *Am. Farm Lines*, 397 U.S. at 539.

Several considerations lead us to conclude that the BIA's decision whether to employ the AWO procedure in a particular case is committed to agency discretion and not subject to judicial review. First, an administrative agency's decision about how to allocate its scarce resources to accomplish its complex mission traditionally has been free from judicial supervision. This tradition of deference is rooted in the separation of powers, and the respect of the judiciary for the functions of a coordinate

branch of government. It is "absolutely clear" that absent constitutional constraints or extremely compelling circumstances, "administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) (internal quotations and citations omitted). Well before enactment of the APA, the Supreme Court recognized that "'administrative agencies and administrators will be familiar with the industries which they regulate and will be in a better position than federal courts or Congress itself to design procedural rules adapted to the peculiarities of the industry and the tasks of the agency involved.'" *Id.* at 525 (quoting *FCC v. Schreiber*, 381 U.S. 279, 290 (1965)); *see also FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 138 (1940).

The Attorney General's explanation for the AWO procedure demonstrates the applicability of these principles to the immigration review process:

> To operate effectively in an environment where over 28,000 appeals and motions are filed yearly, the Board must have discretion over the methods by which it handles its cases. The process of screening, assigning, tracking, drafting, revising, and circulating cases is extremely time consuming. Even in routine cases in which all Panel Members agree that the result reached below was correct, disagreements concerning the rationale or style of a draft decision can require significant time to resolve. The Department has determined that the Board's resources are better spent on cases where there is a reasonable possibility of reversible error in the result reached below.

Streamlining, 64 Fed. Reg. at 56,137. We believe that the tradition of agency discretion over internal procedures is particularly strong in this case, because "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate

questions of foreign relations.'" *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (quoting *INS v. Abudu,* 485 U.S. 94, 110 (1988)).

Second, our review of the text, structure, and history of the streamlining regulations leads us to conclude that the Attorney General surely did not intend to create substantive rights for aliens in the determination whether a particular decision of an IJ was affirmed without opinion. As the Department of Justice explained when adopting the initial streamlining regulations:

> The number of appeals filed with the Board in recent years has exceeded the Board's capacity to give meaningful, three-Member consideration to each appeal, and to issue written decisions in every case. The summary affirmance process is a reasonable response to the current situation, because it allows the Board to concentrate its resources on cases where there is a reasonable possibility of reversal, or where a significant issue is raised in the appeal, while still providing assurances that correct results are achieved in all cases under the Board's appellate jurisdiction.

Streamlining, 64 Fed. Reg. at 56,138. The Justice Department again stressed the importance of streamlining as a management tool when amending the regulations in 2002: "The Department has concluded that streamlining has proven to be an effective procedure for managing an ever-increasing caseload and will significantly assist and promote fair and expeditious review of all pending and incoming appeals while maintaining a respondent's rights to a reasoned administrative decision." Procedural Reforms to Improve Case Management, 67 Fed. Reg. at 54,885. Consistent with this theme, the AWO regulation appears in a section entitled "Case management system." 8 C.F.R. § 3.1(e).

To say the least, judicial review of the BIA's streamlining decision would have "disruptive practical consequences" for the Attorney General's administration of the alien removal process. *Cf. Southern Ry. Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 457 (1979). It is, of course, a basic principle of administrative law that

where agency action is subject to judicial review, the agency must provide an adequate reasoned explanation of its decision. *SEC v. Chenery Corp.*, 318 U.S. 80, 94-95 (1943); *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The Attorney General's streamlining regulations, however, *explicitly prohibit* the BIA from providing any explanation for its decision to affirm without opinion. 8 C.F.R. § 3.1(e)(4)(ii). The reason seems evident: If the BIA were required to explain in each case why the result reached by the IJ was correct, why any errors were harmless or nonmaterial, why the issues on appeal are squarely controlled by precedent and do not involve application of precedent to a novel factual situation, and why the issues are not so substantial that the case warrants issuance of a written opinion, *see id.* § 3.1(e)(4)(i), then the BIA would be required to write the functional equivalent of a written opinion on the merits in every adjudication. Indeed, if we were to hold that the streamlining decision is subject to judicial review, then we would expect aliens regularly to challenge the BIA's affirmance without opinion on the ground that it failed to provide an adequate explanation for its judicially reviewable decision to affirm without opinion.

It is readily apparent, however, that by setting criteria for which cases should be decided through affirmance without opinion, the Attorney General did not "intend[ ] primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion." *Am. Farm Lines*, 397 U.S. at 538. We believe the Attorney General intended primarily to provide BIA members with a mechanism to use their scarce resources efficiently as they carried out the Attorney General's responsibility to enforce the immigration laws. In this regard, we think the Justice Department's regulation is not unlike this court's Rule 47B, which provides that a judgment may be affirmed without opinion in certain enumerated circumstances. *See* 8th Cir. Rule 47B.[4] It has never been thought that the Supreme

_____

[4]Rule 47B provides, in pertinent part:

-11-

Court would review the propriety of this court's decision to affirm a district court without opinion under Rule 47B, as opposed to the merits of the underlying decision, and we see no reason to believe that the Department of Justice intended its comparable rule to have a different effect.

Third, the specific determinations that Ngure would have us review are not amenable to judicial consideration. For a court to rule that Ngure's case did not satisfy the criteria for affirmance without opinion, it would have to conclude either (1) that the result reached by the IJ was incorrect (including that any errors made by the IJ were not harmless), or (2) that the BIA was wrong to find that "factual or legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion in the case." 8 C.F.R. § 3.1(e)(4)(i).[5] We conclude that it is not

A judgment or order appealed may be affirmed or enforced without opinion if the court determines an opinion would have no precedential value and any of the following circumstances disposes of the matter submitted to the court for decision:

> (1) a judgment of the district court is based on findings of fact that are not clearly erroneous;

> (2) the evidence in support of a jury verdict is not insufficient;

> (3) the order of an administrative agency is supported by substantial evidence on the record as a whole; or

> (4) no error of law appears.

[5]Under the regulation, a showing that the issues on appeal are not "squarely controlled by existing Board or federal court precedent" or that they involve "the application of precedent to a novel factual situation," 8 C.F.R. § 3.1(e)(4)(i)(A), is not sufficient to preclude affirmance without opinion, because such a case should still be affirmed without opinion if the issues are "not so substantial that the case warrants the issuance of a written opinion in the case." *Id.* § 3.1(e)(4)(i)(B). Thus, *dictum* in

possible to devise a meaningful and adequate standard of review with respect to either point.

Review of the first issue -- whether the result reached by the IJ was correct -- presents a situation similar to that which the Supreme Court confronted in *ICC v. Locomotive Engineers*. There, the Court considered the authority of the Interstate Commerce Commission to reopen a proceeding and reconsider its prior actions because of "material error." In holding that the ICC's refusal to reopen a proceeding was committed to agency discretion by law, the Court observed that an appeal of such a refusal "places before the courts precisely the same substance that could have been brought there by appeal from the original order -- but asks them to review it on the strange, one-step-removed basis of whether the agency decision is not only unlawful, but *so* unlawful that the refusal to reconsider it is an abuse of discretion." *Locomotive Engineers*, 482 U.S. at 279. The Court concluded that an appeal of a refusal to reopen proceedings "serves no purpose whatever," because the aggrieved party could simply appeal the original order directly to the courts. *Id.* Noting that federal courts often deny rehearing petitions without subjecting that denial (as opposed to the underlying decision) to further appellate review, the Supreme Court held that the APA codified a tradition of nonreviewability that exists with regard to refusals to reconsider for material error, by agencies as well as by lower courts. *Id.* at 280.

The BIA's decision to affirm without opinion is comparable to the ICC's decision to deny a motion to reopen in important respects. When the BIA summarily affirms, the decision of the IJ becomes the final agency determination. An alien may petition the court of appeals for review of the agency decision. Ngure, however, would have this court review *both* whether the result of the IJ's decision was correct,

_____

*Georgis*, 328 F.3d at 967 n.4, that it "seems preferable" for a court to require a written opinion when it believes that a case is not "controlled by existing Board or federal court precedent" does not resolve the issue of reviewability.

*and* whether the BIA was correct to conclude that the result of the IJ's decision was correct. Review of the BIA's determination would duplicate the review of the merits already undertaken, but "on the strange, one-step removed basis" of whether the IJ's decision not only is wrong, but *so* wrong that affirming it without opinion was an abuse of discretion. *Id.* at 279. As in *Locomotive Engineers*, an appeal to determine whether the BIA was correct to find that the IJ's decision was correct serves "no purpose whatever" when the court can directly review the IJ's decision. *Id.*; *see also Georgis*, 328 F.3d at 967 & n.4 (observing that "it makes no practical difference whether the BIA properly or improperly streamlined review of Georgis's case" because the court of appeals reviews directly the decision of the IJ). And where a statute precludes judicial review of the IJ's determination, the court of appeals also lacks jurisdiction to review the BIA's decision to affirm without opinion, because such review would require the court to examine the merits of the IJ's unreviewable determination. *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 854 (9th Cir. 2003).

With respect to the second issue -- whether the issues presented to the BIA were "so substantial that the case warrants the issuance of a written opinion" -- we conclude that there is no manageable standard for judicial review. The question here is not whether the issues are "substantial" in the abstract, or whether the case presents a "substantial question of law or fact," as in the familiar determination for release of a criminal defendant pending appeal. *See, e.g.,* 18 U.S.C. § 3143(b)(1)(B); *United States v. Powell*, 761 F.2d 1227, 1231-32 (8th Cir. 1985). The term "substantial" is modified in the regulation by the requirement that the issues be "*so* substantial" that they *warrant the issuance of a written opinion*. 8 C.F.R. § 3.1(e)(4)(i)(B) (emphasis added).

Whether a particular case "warrants the issuance of a written opinion" is necessarily a function of the BIA's limited resources at a particular point in time, and the views of members of the BIA as to whether those limited resources should be dedicated to writing an opinion in a given case. That decision about allocation of

-14-

resources turns on a determination by the BIA members, given their expertise in the field and their experience in reviewing thousands of administrative appeals, whether the administration of the immigration laws would be enhanced by publishing an opinion. *See* 8 C.F.R. § 3.1(e)(6). We respectfully disagree, therefore, with *dictum* from our sister circuit in *Denko v. INS*, 351 F.3d 717, 732 (6th Cir. 2003), that "the size of the BIA's caseload -- a factor which the Board may be better equipped to assess -- has no relevance in deciding which cases are appropriate for summary affirmance." As the Department of Justice explained in 1999:

> The summary affirmance system represents a careful balancing of the need to ensure correct results in individual cases with the efficiencies necessary to maintain a viable appellate organization that handles an extraordinarily large caseload. The streamlining system will allow the Board to manage its caseload in a more timely manner while permitting it to continue providing nationwide guidance through published precedents in complex cases involving significant legal issues.

Streamlining, 64 Fed. Reg. at 56,138. Like other decisions committed to agency discretion by law, the BIA's streamlining determination "involves a complicated balancing of a number of factors which are peculiarly within its expertise," *Chaney*, 470 U.S. at 831, including the size of the BIA's caseload and the limited resources available to the BIA.

As even Ngure concedes, moreover, "[t]he regulation provides no guidance about what would make a factual or legal issue 'not so substantial' that a written decision is not warranted." (Brief of Petitioner at 13). The regulations do specify that one of several enumerated circumstances must be present before the BIA is permitted to employ a three-member panel, 8 C.F.R. § 3.1(e)(6), but they do not require that the BIA *must* issue a written opinion in any particular circumstance. We thus part company with the Tenth Circuit, which found it significant that the circumstances in which three-member panel review is *permissible* "have nothing to do with the BIA's

-15-

caseload or other internal circumstances." *Batalova v. Ashcroft*, 355 F.3d 1246, 1253 (10th Cir. 2004). If the courts fashion a lower threshold or different criteria than the BIA for determining what is "substantial" enough to *require* a written opinion, then the judiciary may well compel the BIA to issue more opinions than it is equipped to produce, thus undermining the resource allocation goals that led to the streamlining process in the first place. This presumably is why the Department of Justice made clear in 2002 that it did not intend to cause "judicial enforcement" of three-member panel review, and accordingly crafted regulatory language to ensure that a single BIA member has "discretion" to refer cases to a panel in accordance with 8 C.F.R. § 3.1(e)(6). *See* Procedural Reforms to Improve Case Management, 67 Fed. Reg. at 54,888. We believe the regulation is designed not to provide aliens with an enforceable right to written opinions, but rather to give the BIA flexibility to decide whether a particular issue, at a particular time, warrants the dedication of scarce resources.

Ngure relies on *Haoud v. Ashcroft*, 350 F.3d 201 (1st Cir. 2003), for the proposition that this case should be remanded to the BIA for a written opinion.[6] Like Ngure's case, *Haoud* involved a decision of an IJ that denied an alien's claim for

---

[6]Whether the court of appeals has jurisdiction to review the BIA's decision to streamline a particular case has been discussed in only a few published judicial opinions. The Tenth Circuit has held that the decision to streamline a particular case is reviewable, *Batalova v. Ashcroft*, 355 F.3d 1246, 1252-53 (10th Cir. 2004), while the Fifth Circuit has held it unreviewable. *Garcia-Melendez v. Ashcroft*, 351 F.3d 657, 662-63 (5th Cir. 2003). The Ninth Circuit has held that it lacks jurisdiction to review a streamlining decision in a case involving the hardship requirement of cancellation of removal, but stated in *dicta* that not all streamlining decisions are committed to agency discretion. *Falcon Carriche*, 350 F.3d at 853-54. Other courts have stated that streamlining was appropriate in a particular case without addressing the threshold question whether the matter is committed to agency discretion by law, *Gonzalez-Oropeza v. U.S. Att'y Gen.*, 321 F.3d 1331, 1333 (11th Cir. 2003), or by "assuming" that the court has jurisdiction. *Denko*, 351 F.3d at 732.

asylum on alternative grounds, one of which was subject to judicial review (insufficient evidence of persecution), and one of which was declared unreviewable by statute (untimely asylum application). *Id.* at 206. The First Circuit held that the BIA's decision to streamline was subject to judicial review, because the "Board's own regulation provides more than enough 'law' by which a court could review the Board's decision to streamline," and because "[e]specially when the Board's review of an IJ's decision often hinges on Circuit court precedent, we are well-equipped, both statutorily and practically, to review a decision to streamline." *Id.* The court observed that after the IJ rejected the alien's persecution claim, the BIA had filed a new decision that appeared to support the alien's claim. *Id.* at 203-04. The court expressed concern that it could not determine from the AWO whether the BIA had affirmed the IJ's decision based on the absence of persecution (which the court thought dubious in light of the new precedent) or on untimeliness (which was judicially unreviewable). *Id.* at 206-07. Accordingly, the court remanded the case for further agency proceedings during which the BIA could spell out its reasoning. *Id.* at 207-08.

In some respects, we respectfully disagree with the First Circuit. For the reasons previously discussed, we do not agree that the determination to streamline a particular case is generally amenable to judicial review. We also believe that the proper focus for the reviewing court is on the decision of the *agency* (which, by regulation, is the decision of the IJ in this case), not on whether the reviewing court can discern the reasoning of an agency *component* such as the BIA (or the Attorney General, for that matter, when he declines to review a decision of the BIA, *see* 8 C.F.R. § 3.1(h)). Principles of administrative law require that *the agency* provide a reasoned explanation for its decision, *see Chenery*, 318 U.S. at 94-95, and the opinion of an IJ satisfies this requirement regardless whether the grounds relied upon by the IJ are subject to judicial review. That an alien might be unable to challenge the explanation of the IJ under the statute enacted by Congress does not mean that the agency failed to provide a reasoned explanation for its decision.

Our decision in this case need not conflict with *Haoud*, however, because the First Circuit's decision can be read more narrowly. *Haoud* may be understood as permitting judicial review of the decision to streamline only in a narrow species of cases, namely, those in which there is both a reviewable and a non-reviewable basis for the IJ's decision *and* a new development in the law that may have undermined the reasoning of the IJ on the reviewable issue. *Haoud* involved an intervening decision of the BIA, and the First Circuit was concerned that "there is no way we can determine from the AWO whether the Board reviewed the case and found a legitimate way of distinguishing the [BIA's intervening decision] in denying Haoud's asylum claim." *Haoud*, 350 F.3d at 207. In our own cases involving the Social Security Administration's Appeals Council, we have held that while the decision to deny review generally is unreviewable, *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994); *Browning v. Sullivan*, 958 F.2d 817, 822-23 (8th Cir. 1992), the court of appeals may remand a case if the Appeals Council denies review without considering new and material evidence. *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992). There may be reasons to conclude that not even that level of judicial review of the BIA's streamlining decision is available, given differences in the regulatory schemes, but we need not resolve that issue here, because Ngure (unlike Haoud) points to no intervening legal developments that might have affected the decision in his case.

Accordingly, we hold that the BIA's decision to affirm without opinion in Ngure's case is not subject to judicial review. The decision of the IJ constitutes the decision of the agency, and we turn next to a consideration of that decision.

III.

A.

The IJ rejected Ngure's asylum claim on alternative grounds. The IJ concluded that Ngure had failed to apply for asylum within one-year of his arrival in the United

-18-

States as required by statute, 8 U.S.C. § 1158(a)(2)(B), and that he did not demonstrate "changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application." *Id.* § 1158(a)(2)(D). The IJ decided, alternatively, that Ngure had not demonstrated the requisite well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion if he were returned to his native Kenya. *See id.* § 1101(a)(42)(A).

On appeal, Ngure argues that there were "exceptional circumstances" that prevented him from filing a timely application for asylum. Congress, however, has precluded judicial review of the Attorney General's determination that an alien did not demonstrate changed or extraordinary circumstances relating to the delay in filing an asylum application. *Ismailov v. Reno*, 263 F.3d 851, 855 (8th Cir. 2001); 8 U.S.C. § 1158(a)(3). Accordingly, we lack jurisdiction to consider Ngure's challenge to the IJ's timeliness determination, and his petition for review of the Attorney General's denial of asylum must be rejected.

B.

Ngure also claims that he is entitled to withholding of removal under 8 U.S.C. § 1231(b)(3), which is not subject to a one-year filing deadline. To obtain that relief, an alien must show that there is a clear probability that he would suffer future persecution, in the country to which the alien will be removed, because of the alien's race, religion, nationality, membership in a particular social group, or political opinion. *Francois v. INS*, 283 F.3d 926, 932-33 (8th Cir. 2002); 8 U.S.C. § 1231(b)(3). In other words, an alien must establish that it is more likely than not that he will suffer persecution. *INS v. Stevic*, 467 U.S. 407, 429-30 (1984).

The IJ first analyzed whether Ngure established a well-founded fear of persecution to support his application for asylum, and concluded that he had not made

the requisite showing. The IJ then concluded that because withholding of removal requires a greater showing of likely persecution than does asylum, Ngure's claim for withholding of removal necessarily failed as well. We follow the same analysis by first reviewing the IJ's determination that Ngure did not have a well-founded fear of persecution, and then considering his request for withholding of removal.

To demonstrate a well-founded fear of persecution, an alien must demonstrate that he genuinely fears persecution, and produce "credible, direct, and specific evidence that a reasonable person in the alien's position would fear persecution if returned to the alien's native country." *Francois*, 283 F.3d at 930. An IJ's decision on this point will be upheld so long as it is supported by substantial evidence on the record as a whole. *Menendez-Donis v. Ashcroft*, 360 F.3d 915, 918 (8th Cir. 2004). Our review takes into account evidence that both supports and opposes the conclusion of the agency, but the evidence "need not rise to the level of a preponderance" to sustain the decision. *Id.* at 919. To reverse the decision of the agency, we must find that the evidence "was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992).

Ngure asserts that he suffered past persecution when he was arrested in Kenya in 1987, 1990, and 1994. In the absence of a statutory definition, our court has defined persecution as "the infliction or threat of death, torture, or injury to one's person or freedom, on account of race, religion, nationality, membership in a particular social group, or political opinion." *Regalado-Garcia v. INS*, 305 F.3d 784, 787 (8th Cir. 2002). That general definition must be refined further in the context of a particular alien's situation.

We conclude that the IJ was not compelled to find that Ngure's three prior arrests established persecution. The arrests in 1987, 1990, and 1994 came after demonstrations that became riotous, and officials arrested hundreds of participants,

-20-

including Ngure.  His arrests in 1987 and 1994 resulted in detentions of less than twenty-four hours and involved no physical abuse.  We have held that "[b]rief periods of detention do not necessarily constitute persecution."  *Al Tawm v. Ashcroft*, 363 F.3d 740, 743 (8th Cir. 2004) (no past persecution where petitioner was detained on two occasions for only a few hours each); *see also Eusebio v. Ashcroft*, 361 F.3d 1088, 1091 (8th Cir. 2004) (brief detentions lasting two or three days do not constitute persecution); *Safaie v. INS*, 25 F.3d 636, 640 (8th Cir. 1994) ("Generally, brief confinements for political opposition to a totalitarian regime do not necessarily constitute persecution.").

Ngure's 1990 arrest was more serious, but not sufficient to compel a finding of persecution.  When swept up by the police after a demonstration turned riotous, Ngure was hit with batons and truncheons.  These assaults resulted in bruising, but did not require medical attention.  This court has held that minor beatings or brief detentions suffered in the wake of political demonstrations do not compel a finding of past persecution. *Eusebio*, 361 F.3d at 1090-91.  We recently reiterated that "[t]he mere presence of some physical harm does not require a finding of past persecution." *Al Tawm*, 363 F.3d at 743.

It is also important to consider whether an act of violence is an isolated occurrence, or part of a continuing effort to persecute on the basis of a factor enumerated in the statute. Generally speaking, evidence of isolated violence does not compel a finding of persecution. *Fisher v. INS*, 291 F.3d 491, 497-98 (8th Cir. 2002). Although Ngure was detained for three weeks in 1990, he was released when his brother-in-law posted bond.  Ngure was not charged with any crime, and there is no evidence that the Kenyan government had any "continuing interest" in him after his release. *See Prasad v. INS*, 47 F.3d 336, 339 (9th Cir. 1995).  Ngure admits that his later arrest in 1994 was the result of being "in the wrong place at the wrong time," and he testified that when he left for the United States in 1995, he planned to return to Kenya.  We conclude, therefore, that the evidence relating to Ngure's prior arrests

is not so substantial that a reasonable fact finder is compelled to find past persecution. *E.g.*, *Nelson v. INS*, 232 F.3d 258, 264 (1st Cir. 2000) (reasonable fact finder was not compelled to find past persecution when petitioner went through "three episodes of solitary confinement of less than 72 hours, each accompanied by physical abuse"); *Prasad*, 47 F.3d at 340 (upholding conclusion of no persecution where petitioner was hit and kicked while briefly detained in police station, but did not require medical attention, was not charged with any crime, and was not subject of any "continuing interest" by government); *Kapcia v. INS*, 944 F.2d 702, 704, 708 (10th Cir. 1991) (upholding conclusion of no past persecution where petitioner had been arrested "four times, detained three times, and beaten once" and co-petitioner twice had been "detained for a two-day period during which time he was interrogated and beaten").

Ngure testified that he feared future persecution because the government issued a warrant for his arrest in 1996, after Ngure failed to report to police in accordance with a bond requirement that was established after his 1994 arrest. On this point, the IJ found that there was no well-founded fear of persecution because the warrant was "stale," and the government was within its rights to issue a warrant for Ngure when he defaulted on his recognizance bond. We are not persuaded that the IJ was compelled to find that these circumstances established an objectively reasonable fear of persecution on account of political opinion.

Criminal prosecution for violation of a fairly administered law does not constitute persecution. *El Balguiti v. INS*, 5 F.3d 1135, 1136-37 (8th Cir. 1993); *Behzadpour v. United States*, 946 F.2d 1351, 1353 (8th Cir. 1991). Ngure has not produced evidence that the criminal charges against him were improperly motivated or that he would receive an unfair trial. Ngure does argue that the 1996 warrant was issued because the Kenyan government was aware of his activities during the 1987 and 1990 demonstrations. The evidence, however, does not compel the conclusion that the Kenyan government's issuance of an arrest warrant for violating a bond and reporting requirement imposed in the wake of a riotous demonstration was really an

effort to persecute Ngure because of his political opinion. Ngure did not prove, moreover, that other persons who violated recognizance bonds were free from arrest warrants or criminal charges.

Ngure next attempts to establish that his fear of persecution is objectively reasonable by comparing himself to abused individuals identified in United States and United Kingdom country condition reports. United States Dep't of State, *1999 Country Reports on Human Rights and Practices*, Kenya (Feb. 25, 2000); United Kingdom Home Office, *Asylum in the UK*, Kenya Assessment (April 2000). Generally, an asylum-seeker must show an objectively reasonable fear of "particularized persecution." *Feleke v. INS*, 118 F.3d 594, 598 (8th Cir. 1997). Without evidence of particularized persecution, an applicant nonetheless may obtain asylum if he can show:

> (A) The applicant establishes that there is a pattern or practice in his or her country of nationality or, if stateless, in his or her country of last habitual residence, of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

> (B) The applicant establishes his or her own inclusion in and identification with, such group of persons such that his or her fear of persecution upon return is reasonable.

8 C.F.R. § 208.13(b)(2)(iii). A pattern or practice of persecution must be systemic, pervasive, or organized. *Makonnen v. INS*, 44 F.3d 1378, 1383 (8th Cir. 1995).

We conclude that a reasonable fact finder could find that Ngure did not possess a well-founded fear of persecution based on the country reports. First, his Kikuyu ethnicity alone does not establish a present fear of persecution. While Ngure claims that individuals identified in the country condition reports are Kikuyu, the evidence

-23-

does not compel the conclusion that they were abused *on account of* their ethnicity. Ngure did testify that two of his cousins from the Rift Valley were forced to leave their homes in 1992 due to ethnic violence. But this incident occurred over ten years ago, and Ngure has not offered proof that he must live near the Rift Valley or any other area that regularly experiences ethnic turmoil.

Second, Ngure's pro-democracy political opinion also does not provide the necessary basis for a well-founded fear of particularized persecution. The country condition reports do not show that individuals like Ngure -- who was arrested over ten years ago in pro-democracy demonstrations-turned-riots -- are being subjected to death, imprisonment, or severe injury. Nor is there evidence that Ngure maintained any connections with Kenyan dissident groups after his time at the university or while in the United States. *See Regalado-Garcia*, 305 F.3d at 788. Ngure has not shown he is similarly situated to any of the individuals identified in the country condition reports as victims of abuse on account of their political positions. *See Feleke*, 118 F.3d at 598-99.

Finally, Ngure's claim that the IJ was compelled to find a well-founded fear on account of his Christian Science beliefs is without merit. Ngure's only allegation of religious persecution is an occasion when the police forced his Christian Science group to disperse from a park because they did not have a permit. This confrontation did not result in violence, an arrest, or a fine. The country condition reports provide no information regarding the abuse of followers of Christian Science. Instead, the UK Home Office Report recounts that the Kenyan Constitution "provides for freedom of religion and the Government generally respects this right in practice," although on occasion it has interfered with the non-worship activities of religious groups. United Kingdom Home Office, *Asylum in the UK*, Kenya Assessment, §§ 5.56-5.58. *See Valioukevitch v. INS*, 251 F.3d 747, 749 (8th Cir. 2001) (no well-founded fear of persecution where government guaranteed freedom of religion and ability to proselytize).

-24-

In sum, we conclude that a reasonable factfinder could find that Ngure had not established a well-founded fear of persecution upon return to Kenya. Given our conclusion that the evidence did not compel the IJ to find a well-founded fear of persecution, we conclude that the IJ also did not err in declining to grant withholding of removal under the higher standard of proof applicable to that form of relief. *See Francois*, 283 F.3d at 932-33.

C.

Ngure's final request is for relief under the Convention Against Torture. To qualify for such relief, an alien must demonstrate that "it is more likely than not that he or she would be tortured if returned to the proposed country of removal." *Perinpanathan v. INS*, 310 F.3d 594, 599 (8th Cir. 2002); 8 C.F.R. § 208.16(c)(2) (2000). In assessing this claim, all evidence relevant to the possibility of future torture should be considered, including, but not limited to: past torture inflicted upon the applicant; the applicant's ability to relocate to another area of the country where torture is unlikely; and gross, flagrant, or mass violations of human rights. 8 C.F.R. § 208.16(c)(3). We review the agency's denial of relief to determine whether the evidence was so compelling that a reasonable factfinder must have found the alien entitled to relief under the Convention. *Habtemicael v. Ashcroft*, 360 F.3d 820, 824 (8th Cir. 2004).

Ngure argues that the country condition reports provide substantial evidence of gross, flagrant, or mass violations of human rights in Kenya. The State Department report regarding Kenya does conclude that the "[g]overnment's human rights record was generally poor," and "[s]ecurity forces continued to use lethal force and committed a number of extrajudicial killings." *1999 Country Reports on Human Rights and Practices*, Kenya at 1-2. These reports alone, however, are insufficient to demonstrate that it is more likely than not that a particular individual will be tortured by the government if returned to Kenya. *Tarrawally v Ashcroft,* 338 F.3d

180, 188 (3d Cir. 2003).  Ngure's reliance on the State Department's report of the torture of a student leader also is not sufficient to compel reversal of the agency, because Ngure has not provided evidence that he is similarly situated to this individual.

*      *      *

For the foregoing reasons, the petition for review is denied.

_____