# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 04-2479

———————

| | |
|---|---|
| Mohamed Turay, | * |
| | * |
| Petitioner, | * |
| | * Petition for Review of an Order of |
| v. | * the Board of Immigration Appeals. |
| | * |
| John Ashcroft, Attorney General | * |
| of the United States, | * |
| | * |
| Respondent. | * |

———————

Submitted: February 18, 2005
Filed: April 26, 2005

———————

Before LOKEN, Chief Judge, RILEY, and SMITH, Circuit Judges.

———————

SMITH, Circuit Judge.

Mohamed Turay appeals from the Board of Immigration Appeals (BIA) dismissal of his application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). Turay argues that he suffered persecution based on his imputed political opinion and that the immigration judge ( IJ) should not have discounted his credibility. We affirm.

## I. *Background*

Turay is a citizen of Sierra Leone who came to the United States in 2001 and timely sought refugee status. Turay contends that he was a victim of past persecution for his political beliefs. In support, Turay recounted the incidents that precipitated his departure from Sierra Leone during its civil war. Specifically, Turay was physically assaulted and kidnapped by the Kamajors, a pro-government rebel group that invaded his residence. At the time, Turay believed the Kamajors were anti-government. Turay stated "they want me to join in their fight . . . but their fight [was] with the government and I don't even know why they are fighting, but I don't want to join them in that fight." Turay tried to hide from the rebels but they captured him.

Once in Kamajor custody, Turay was questioned by the rebels about his political allegiance. Turay testified that he did not tell the rebels his political opinion because Turay believed the rebels would kill him due to his pro-government stance. The rebels tried to recruit Turay but he refused. The rebels, assuming that Turay opposed the government, repeatedly physically assaulted him, including the infliction of knife wounds[1]. The rebels also burned down Turay's house and forced Turay to carry loads for them. Turay testified that the Kamajors "wanted to overthrow [President Kabbah] because they wanted to take over [] power."

Turay initially fled to Guinea to escape persecution. In his asylum application, Turay indicated that he "managed to escape one night when everybody was asleep and everything was quiet." However, in an interview before an asylum officer, Turay stated that he was able to escape because government forces attacked and overpowered the rebels. Turay blamed the inconsistency on errors in his written application and insisted that his oral testimony was correct because the "person who filled [out] the form misunderstood." The rest of Turay's family also fled Sierra

---

[1]Turay has a one-inch scar on his right arm, an inch mark on his left arm, and a two-inch scar on his left leg.

Leone. Turay's parents went to Gambia but his siblings are still missing and presumed dead. Turay came to the United States from Guinea.

Turay applied for asylum, withholding of removal, and protection under CAT. At Turay's hearing, the IJ asked Turay whether he knew of Foday Sankoh. Turay replied that he did not. Turay's application was denied in large measure based upon the IJ's findings that Turay's account and supporting evidence lacked credibility.[2] Turay appealed to the BIA. The BIA affirmed the IJ's decision and dismissed Turay's appeal finding that Turay failed to present credible evidence in support of his application. Turay now appeals from the BIA's dismissal.

## II. *Discussion*
### A. *Standard of Review*

We review questions of law de novo, *Tang v. INS*, 223 F.3d 713, 718–19 (8th Cir. 2000); *Ikenokwalu-White v. INS*, 316 F.3d 798, 804 (8th Cir. 2003), and we review an IJ's fact determinations by applying the substantial evidence test. *Melecio-Saquil v. Ashcroft*, 337 F.3d 983, 986–87 (8th Cir. 2003); *Perinpanathan v. INS*, 310 F.3d 594, 597 (8th Cir. 2002). Under that test, we must affirm if the IJ's decision is supported by reasonable, substantial, and probative evidence. *Melecio-Saquil*, 337 F.3d at 986–97; *Perinpanathan*, 310 F.3d at 597. Fact determinations may be reversed only if the petitioner demonstrates that the evidence was so compelling that no reasonable fact finder could fail to find in favor of the petitioner. *Melecio-Saquil*, 337 F.3d at 986; *Perinpanathan*, 310 F.3d at 597.

---

[2]Turay testified that his parents gave him his birth certificate and Sierra Leone national identity card. At Turay's hearing, the INS submitted into evidence a Forensic Document Laboratory report showing that Turay's birth certificate did not conform to the standard for a birth certificate from Sierra Leone. Also, the authenticity of Turay's identity card was questionable due to its "poor quality of production, lack of natural wear characteristics and obscured signature in the data entry heading."

B. *Law Governing Asylum, Withholding of Removal,*
*and Convention Against Torture*

The Attorney General has discretion to grant asylum to a "refugee." 8 U.S.C. § 1158(b)(1)(1999). Refugee is defined as "any person who is outside of the country of his nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to avail himself [] of the protection of, that country because of persecution or a well found fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(1999).

In resolving most asylum cases, "the critical inquiry is whether the applicant has a well-founded fear of future persecution upon return to his or her country." *Perinpanathan*, 310 F.3d at 597–598 (citing *Kratchmarov v. Heston*, 172 F.3d 551, 553 (8th Cir. 1999)). A well-founded fear must be both "subjectively genuine and objectively reasonable." *Id.*; *Feleke v. INS*, 118 F.3d 594, 598 (8th Cir. 1997). "An alien may establish the subjective element with credible testimony that he or she genuinely fears persecution." *Francois v. INS*, 283 F.3d 926, 930 (8th Cir. 2002) (citing *Ghasemimehr v. INS*, 7 F.3d 1389, 1390 (8th Cir.1993). Objectively, the alien must show "credible, direct, and specific evidence that a reasonable person in the alien's position would fear persecution if returned to the alien's native country." *Id.* This fear "must have [a] basis in reality and must be neither irrational nor so speculative or general as to lack credibility." *Perinpanathan*, 310 F.3d at 598.

Where an alien establishes past persecution under one of the qualifying grounds, there is a presumption of a well-founded fear of future persecution on the same ground. *Francois*, 283 F.3d at 930; 8 C.F.R. § 208.13(b)(1). The government may rebut this presumption by showing a fundamental change in circumstances in the alien's home country by a preponderance of the evidence. *Francois*, 283 F.3d at 930–31; *Perinpanathan*, 310 F.3d at 598; 8 C.F.R. §§ 208.13(b)(1)(i)(A) and (B).

An application for asylum automatically includes a request for withholding of removal. 8 C.F.R. § 1208.3(b); *see INS v. Stevic*, 467 U.S. 407, 420 n.13 (1984). An alien may not be removed if the alien shows there is a clear probability that his "life, or freedom would be threatened in [the alien's] country because of the alien's race, religion, nationality, membership in a particular social group or political opinion." 8 U.S.C. § 1231(b)(3)(A)(1999); *Ngure v. Ashcroft*, 367 F.3d 975, 989 (8th Cir. 2004). The standard for withholding of removal, a clear probability of persecution, is more rigorous than the well-founded fear standard for asylum. *Rife v. Ashcroft*, 374 F.3d 606, 613 (8th Cir. 2004); *Wondmneh v. Ashcroft*, 361 F.3d 1096, 1099 (8th Cir. 2004). An alien who fails to prove eligibility for asylum cannot meet the standard for establishing withholding of removal. *Ngure*, 367 F.3d at 992.

Under CAT, an alien must show that "it is more likely than not that he [] would be tortured if returned to the proposed country of removal." *Ngure*, 367 F.3d at 992 (citing *Perinpanathan*, 310 F.3d at 599); 8 C.F.R. § 208.16(c)(2). In determining eligibility under CAT, "all evidence relevant to the possibility of future torture should be considered including but not limited to: past torture inflicted upon the applicant; the applicant's ability to relocate to another area of the country where torture is unlikely; and gross, flagrant, or mass violations of human rights." *Ngure*, 367 F.3d at 992; 8 C.F.R. § 208.16(c)(3).[3]

### C. *Persecution Based on Turay's Imputed Political Opinion*

Turay first attempts to show past persecution. Turay contends that he was persecuted in the past based upon his imputed political opinion. Turay argues that the Kamajors captured and beat him, believing Turay's silence meant that he had an opposing political opinion. Turay believed the Kamajors were opposed to the

---

[3]Turay offered no new arguments or evidence for his CAT claim. The recent Asylum Reports for Sierra Leone indicate that the situation has stabilized, with a successful election in 2002. Moreover, there were no reported killings by the rebels in the past two years. We therefore deny Turay's CAT claim.

government of Sierra Leone. Turay also argues that the beatings, stabbing, and forced labor amounted to torture and persecution at the hands of the Kamajors.

When making a claim for persecution based on political opinion, it is essential that the victim's political opinion motivates the persecution. *INS v. Ellias-Zacarias*, 502 U.S. 478 (1992). In *Ellias*, the Supreme Court indicated that persecution on account of political opinion does not mean guerrilla kidnapping to "fill their ranks in order to carry on their war against the government." *Id.* at 482. The victim's political opinion matters, not the persecutor's. *Id.* "Thus the mere existence of a generalized 'political' motive underlying the guerrillas' forced recruitment is inadequate to establish (and, indeed, goes far to refute) the proposition that [Petitioner] fears persecution *on account of* political opinion, as § 101(a)(42) requires." *Id.* (emphasis in original). We hold that substantial evidence supports the IJ's determination that Turay was forced to act as a porter for the rebels because the rebels needed a porter and not because of Turay's unrevealed political opinion.

Turay also failed to demonstrate, by compelling evidence, a well-founded fear of future persecution. Turay claims he fears that he will be persecuted by the Kamajors upon returning to Sierra Leone and that there is potential for general civil unrest. Turay offered no evidence to support the contention that the Kamajors would target him for mistreatment. Turay now recognizes that the Kamajors are pro-government. The Kamajors would have no political motive to persecute Turay in the future because Turay also holds a pro-government stance. Finally, as noted by the IJ, Turay could relocate within Sierra Leone because the Kamajors do not have a nation-wide presence. Substantial evidence supports the IJ's finding that Turay did not satisfactorily establish fear of future persecution.

## D. *IJ's Credibility Finding*

The IJ made an adverse credibility finding based on the documents Turay offered, Turay's ignorance as to identity of the leader of the Revolutionary United

Front (RUF), Foday Sankoh, and his ignorance of the political ideology of the Kamajors. "The IJ's adverse credibility findings, however, 'are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.' 8 U.S.C. § 1252(b)(4)(B)." *Pilica v. Ashcroft*, 388 F.3d 941, 952 (6th Cir. 2004).

Turay argues that the IJ should not have made an adverse credibility finding because the documents Turay offered only go to prove nationality, Turay's parents gave him the documents, and he had no control or part in making them. Turay also highlights his lack of education and total ignorance of the rebel groups and their leaders. While extensive knowledge of domestic politics within an applicant's home country should not be a condition of asylum, an applicant relying on a claim of political persecution must nonetheless state a persuasive case that it has actually occurred.

The IJ offered specific, cogent reasons for his credibility findings. These included the numerous discrepancies in Turay's testimony and the false documents he submitted in support of his claim. Turay testified that he received his new birth certificate from his parents at some point in 1996, but on cross-examination, Turay claimed this birth certificate was not issued until 2000. However, the official date of issue listed on Turay's birth certificate is 1974. Turay did not explain this discrepancy. Turay also testified that his old birth certificate was lost during the war and the original could not be found. On cross-examination, Turay stated that his parents took the old birth certificate back and got a new one. Turay's parents "had to leave it there, because nobody could even read it, it was so worn out." Again Turay did not explain this discrepancy. Turay said "Well, my—that is what I said, but maybe it is (sic) lost or they left it there. I don't know. I'm not sure."

Turay first testified that he received his identity card in 2001, but on cross-examination Turay indicated he received it in 1999. Turay testified that his parents submitted his birth certificate to get the identity card. He indicated his parents paid a fee and the card was issued a week later. On cross-examination, Turay indicated that

he had his photo taken in 1999 for the identity card and gave it to his parents who applied for him. Due to a change in procedure, Turay was required to apply in person so his parents took him.

The identity card had an issue date of 1996 and not 1999 or 2001. When asked to clarify the date of issue, Turay stated "Well, maybe my father asked them to push the date of issuance a little back so it would not be seen as a new I.D." When asked why Turay's father would do that, Turay replied "I don't know why they did that, because he just told me that is how he did it."

The IJ found it implausible that Turay, having lived in Sierra Leone during the civil war, did not know that Foday Sankoh led the opposition RUF rebel forces. The IJ also found it implausible that Turay would not have known, or would not have learned, that the Kamajors supported the government. Foday Sankoh was as much a public figure in Sierra Leone as was its president. Given the present record, we are not persuaded to reverse the IJ's credibility determination.

For the foregoing reasons we affirm the decision of the BIA.

_____