# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3019

_____

Genet Gizaw Zewdie,                    *
                                       *
          Petitioner,                  *
                                       *
     v.                                *  Petition for Review of an Order of
                                       *  the Board of Immigration Appeals.
John Ashcroft, Attorney General        *
of the United States,                  *
                                       *
          Respondent.                  *

_____

Submitted: June 15, 2004
Filed: August 27, 2004

_____

Before MURPHY, HEANEY, and BRIGHT, Circuit Judges.

_____

BRIGHT, Circuit Judge.

Genet Zewdie petitions for review of the decision of the Board of Immigration Appeals ("BIA") denying her claims for asylum, withholding of removal, and relief under the Convention Against Torture ("Convention"). We affirm the denial of asylum and withholding of deportation, but we remand Zewdie's claim under the Convention for further proceedings and consideration.

## I.    Background

Zewdie, a citizen of Ethiopia, entered the United States without inspection on August 25, 2000.  She applied for asylum in September 2000.  After learning of Zewdie's presence in this country through her application, the Immigration and Naturalization Service instituted removal proceedings.   Zewdie conceded removability and applied for asylum, withholding of removal, and relief under the Convention.

Zewdie claims that she was persecuted and tortured prior to leaving Ethiopia and that if she returned she would also be tortured.  We begin by explaining from the records and the briefs Zewdie's history in Ethiopia and the conditions in the country at the time she fled.  Zewdie's father belonged to the Oromo ethnic group, the largest ethnic group in Ethiopia, and became an active member in the Oromo Liberation Front ("OLF").  The Oromo people established the OLF in July 1973.[1]  The OLF supports autonomy or independence for the southern provinces of Ethiopia where most Oromo live.  The Oromo possess distinct physical characteristics and have their own language; they live throughout Ethiopia but consider the southern province their heartland.   At one time, the OLF supported the current regime headed by the Ethiopian People's Revolutionary Democratic Front ("EPRDF").  However, the OLF withdrew its support after discovering that the EPRDF manipulated the election process.  In 1993, the OLF took up arms against the government but lost to the government military force.   However, the OLF remains an active clandestine organization in Ethiopia.

Since the uprising, the Ethiopian government has prohibited the OLF from political participation.  Despite the OLF efforts, government interference with

---

[1]Partly taken from United States Dep't of State, *Report on Human Rights Practices*, 2000; Makonnen v. INS, 44 F.3d 1378, 1381-82 (8th Cir. 1995).

elections still occurs. According to the State Department's 2000 report, the last election held in the southern region contained numerous irregularities, including fraud, harassment, intimidation, and political assassination. The OLF has not garnered popular support because it has failed "to organize an effective anti-government movement" within Oromo communities. Thomas P. Ofcansky & LaVerle Berry, United States Dep't of State *Ethiopia: A Country Study* 247 (1993). The OLF continues to oppose the current government in Ethiopia and refuses to accept the government as a legitimate authority.

As a member of the OLF, her father informed the Oromo people of their rights and obligations, criticized the current government, and recruited new members. The Ethiopian government arrested Zewdie's father and kept him imprisoned for two years for supporting the OLF. The government also captured and detained other members of her family because they supported the OLF.[2]

We now turn to evidence presented by Zewdie to the immigration judge. Zewdie claimed that she did not actively participate as a member in the OLF; however, she admitted to sympathizing with the Oromo people and supporting the work of the OLF. Zewdie testified that the Ethiopian government did not approve of her support of the OLF and retaliated against her by imprisoning her and having her fired from her job.

She claimed that her employer of ten years fired her for her connection to the Oromo people and the OLF. In an offer of proof, she submitted a letter from her employer stating that her termination followed the receipt of a letter from Ethiopian

---

[2]The government allegedly killed her father's brother for his OLF activities. Government officials took her brother, possibly because he was sympathetic to the OLF, and after Zewdie arrived in the United States, her mother and Zewdie's husband, who remained in Ethiopia, have disappeared.

government officials. Zewdie believes that the letter from the government informed her employer of her Oromo heritage and her connections to the OLF.

Her imprisonment followed a trip to her father's village in Mojo where she informed the Oromo living in the community of their rights and responsibilities as citizens. During her encounters with the Oromo people in Mojo, she spoke out against the Ethiopian government and encouraged the people to vote in an upcoming election for candidates that best represented the interests of the Oromo people. Members of the Oromo Peoples' Democratic Organization ("OPDO"), an entity set up by the government to undermine the OLF, confronted Zewdie and told her to leave the area.

Zewdie alleges that on returning to her home in Addis Ababa, Ethiopian government officers arrested her for her political activities, including educating the Oromo living in Mojo. She testified that the government held her in Maekalawi Prison for twenty-six days before releasing her on bail. During her time in captivity, government officers beat the soles of her feet repeatedly with wire whips and sticks. At the hearing, she removed her shoes and showed the scars on her feet and ankles to the immigration judge. She further testified that after her release, the officers informed her she could not leave Addis Ababa and ordered her to report her activities to them. Zewdie disobeyed and fled Ethiopia.

The immigration judge questioned Zewdie's credibility, but made no specific finding that Zewdie did not tell the whole truth. The immigration judge denied all three claims of relief on October 4, 2001. The BIA affirmed the immigration judge's decision and questioned Zewdie's credibility. Zewdie timely appeals the BIA's decision to this court.

## II.    Discussion

Zewdie first argues that she qualifies for asylum or withholding of deportation. We have considered her claims regarding these issues and agree with the immigration judge that Zewdie does not qualify for either.  However, Zewdie's remaining arguments for relief under the Convention merit further consideration. See Sivakaran v. Ashcroft, 368 F.3d 1028, 1029 (8th Cir. 2004) (holding that adverse decisions on claims of asylum and withholding of removal do not preclude a Convention claim); Habtemicael v. Ashcroft, 370 F.3d 774, 783 (8th Cir. 2004) (remanding Convention claim after upholding denial of asylum and withholding of removal claims).

We give deference to the BIA's findings of fact and overturn only if the evidence "was so compelling that no reasonable fact finder could fail to find" her eligible for relief under the Convention.  See INS v. Elias-Zacarias, 502 U.S. 478, 483-84 (1992); Habtemicael, 370 F.3d at 779; 8 U.S.C. § 1252(b)(4)(B) (2004). Here, the evidence compels us to vacate the BIA's decision; substantial grounds exist for believing that the Ethiopian government would torture Zewdie if she returned. See Sivakaran, 368 F.3d at 1029 (remanding because the BIA conducted insufficient fact-finding to deny the Convention claim); Habtemicael, 370 F.3d at 783 (remanding the Convention claim for further fact-finding).  See also Guchshenkov v. Ashcroft, 366 F.3d 554, 560 (7th Cir. 2004) (discussing the increase in reversals of BIA decisions despite the deferential standard of judicial review and criticizing immigration judges for their "systematic failure . . . to provide reasoned analysis for the denial of applications for asylum").

Both the immigration judge and the BIA failed to credit Zewdie's testimony and corroborating evidence.  In addition, both failed to consider Zewdie's claims in light of the United States Department of State report on Ethiopia.  We remand because the immigration judge failed to articulate a reasoned analysis based on the

recorded evidence for denying Zewdie's claims. In order to put Zewdie's testimony in context, we begin with an overview of the Convention and the conditions in Ethiopia when Zewdie left.

Women and children make up eighty percent of the twenty-seven million individuals displaced from their homes worldwide; of these women, twenty to thirty percent left their homes because they experienced torture in their home countries. Zewdie's testimony puts her in this category and her treatment falls within the specific purposes behind the Convention.

The United Nations enacted Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment to combat the use of torture throughout the world.[3] The United States ratified the Convention and it went into effect November 20, 1994. Article III of the Convention provides that a signatory country shall not "expel, return or extradite a person to another [country] where there are substantial grounds for believing that he would be in danger of being subjected to torture" in that country. Foreign Affairs Reform and Restructuring Act of 1998 § 2242, Pub. L. No. 105-277 (Oct. 21, 1998); see 22 C.F.R. § 95.1(c) (2004); Habtemicael, 370 F.3d at 780-81. The Convention defines torture as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her

---

[3]The United Nations has reported widespread patterns of torture and ill treatment by government officials in seventy countries, making torture a worldwide problem. Torture occurs not merely in developing countries; the use of torture has become disturbingly legitimized even in industrialized nations facing a perceived threat.

or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1) (2004). Torture does not include "pain or suffering arising only from, inherent in or incidental to lawful sanctions." 8 C.F.R. § 208.18(a)(3).

Before the immigration judge, Zewdie submitted the State Department's 1997 Profile on Ethiopia. The report stated:

Authorities detained hundreds of persons without charge during the year, especially in the Oromiya and Somali regions, for supposed involvement with the OLF and ONLF. Many were ultimately released without an appearance before a judge. Such cases often reflect arbitrary actions by local officials, but also result from a shortage of trained and competent prosecutors and judges.

United States Dep't of State, *Report on Human Rights Practices*, 1997. The report went on to discuss the atrocious conditions of Ethiopian prisons and also stated that "security officials sometimes beat or mistreated detainees."[4]

With this background, we now turn to Zewdie's specific claims. The immigration judge and the BIA denied relief under the Convention to Zewdie, a woman who claims to have suffered extraordinary physical pain at the hands of her government. In order to qualify for relief under the Convention, the applicant bears

[4]The immigration judge all but ignored the State Department's report, only acknowledging that the report stated that "the OLF is an illegal organization in Ethiopia, and it advocates the violent overthrow of the government." The BIA made no mention of the report.

the burden of showing "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). To prove that it is more likely than not that the applicant would be tortured in the country of removal, "all evidence relevant to the possibility of future torture shall be considered." 8 C.F.R. § 208.16(c)(3). Relevant evidence may include:

> (i) Evidence of past torture inflicted upon the applicant;
> (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;
> (iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and
> (iv) Other relevant information regarding conditions in the country of removal.

Id.

The immigration judge and the BIA rejected Zewdie's claims, finding that she did not meet her burden of proof and questioned her credibility.[5] In evaluating credibility determinations we defer to "an immigration judge's credibility finding where the finding is supported by a specific, cogent reason for disbelief." Perinpanathan v. INS, 310 F.3d 594, 597 (8th Cir. 2002) (citations omitted). An immigration judge can base a credibility determination on the lack of corroborating evidence if the judge also encounters inconsistencies in testimony, contradictory evidence, or inherently improbable testimony. Diallo v. INS, 232 F.3d 279, 288 (2d Cir. 2000).

During Zewdie's testimony in front of the immigration judge, she removed her shoes and showed the immigration judge the scars on the bottom of her feet and ankles. She testified, without contradiction, that she received these scars after being

---

[5]Neither the immigration judge or the BIA explicitly found Zewdie not credible.

beaten repeatedly over a period of twenty-six days with wire whips and sticks. She further testified that government officers threatened her with reprisal if she left Addis Ababa. She also submitted several documents supporting her claim. For instance, she submitted an affidavit from Lulsseged Wolkeba, a former resident of Addis Ababa, Ethiopia, stating that Zewdie's "life and security would be in great danger if she is forced to return to Ethiopia"; she submitted a letter from her brother informing her that after she left Ethiopia, the government seized her husband and took him to an unknown location.

Despite Zewdie's testimony and the evidence she presented, the immigration judge and BIA found Zewdie not credible because she could not offer corroborating evidence that the scars on her feet resulted from beatings and because she did not inform the asylum officer of the beatings.[6]

---

[6]The immigration judge in his oral opinion stated in reference to the Convention claim that:

> The Court acknowledges that this is a difficult case. The respondent demonstrated some injuries to her feet. However, there is no medical report to indicate whether these injuries are consistent with the type of abuse that the respondent testified to . . . . In this particular case, considering all of the evidence presented by the respondent . . . and considering the overall lack of meaningful corroboration in this case, the Court believes the respondent has not met her burden of proof.

App. at 22-23.

The BIA's order echoed this language:

> [Zewdie] has also submitted no evidence to establish that it is more likely than not that she will be tortured in Ethiopia.
>     The respondent appears to contend that it should be sufficient that she has scars on her feet and that she showed the scars to the Immigration Judge. However, we agree with the Immigration Judge that

It is unreasonable to expect Zewdie to meet the extraordinary level of corroborating evidence demanded by the BIA. We highly doubt the Maekalawi Prison keeps records regarding prisoner abuse of the kind suffered by Zewdie and we are doubtful that a tortured person in an Ethiopian prison would have access to a physician to verify the torture. Even if such proof existed, we observe that "[i]t is often impossible for an asylum applicant to obtain corroborating evidence from [her] home country." Bellido v. Ashcroft, 367 F.3d 840, 844 (8th Cir. 2004). Corroboration exists for Zewdie's testimony in the scarring on her feet; nothing more is needed. Diallo, 232 F.3d at 288; see also 8 C.F.R. § 208.13(a) ("testimony of [an] applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."). As long as the "applicant's testimony is generally consistent, rational, and believable," inconsistencies in the testimony "need not be fatal to credibility, especially if the errors are relatively minor and isolated." Diallo, 232 F.3d at 288.

Zewdie's failure to mention her beatings to the asylum officer or indicate them on her asylum application should not be dispositive of her credibility, given the obvious translation difficulties revealed in the record.[7] Such a communication failure

> given the lack of any doctor's statement or other corroborating evidence concerning the origin of the scars, coupled with the respondent's failure to indicate in her written application or to the asylum officer that she was beaten on her feet, the fact that she has scars is not sufficient to establish her claim.

App. at 3 (emphasis added).

[7]Zewdie did not have counsel during her interview with the asylum officer. Further, the translator had difficulty translating both the asylum officer's questions and Zewdie's responses. In addition, during oral argument, Zewdie's counsel noted Zewdie's cultural differences regarding her bodily scarring.

-10-

does not rationally outweigh the overwhelming significance of the evidence presented to the immigration judge. The record is clear, the scarring on Zewdie's feet and ankles came from being beaten. No reason exists in this record to disbelieve Zewdie.

We hold that the BIA failed to rationally assess Zewdie's credibility on the torture issue. In light of the evidence presented by Zewdie, no reasonable fact finder could fail to find Zewdie eligible for relief. The evidence of past torture coupled with Zewdie's testimony that the Ethiopian government threatened reprisal if she fled the country and the State Department's report outlining the human abuses present in Ethiopian prisons provide substantial grounds for believing that it is more likely than not Zewdie will be tortured if forced to return to Ethiopia. For these reasons, we must overturn the BIA's decision. On remand, we direct the BIA to assess <u>all</u> of the evidence and come to a reasoned conclusion based on a thorough analysis of the evidence.

---

Ethiopian women are accustomed to abuses and have little redress within their government. <u>See</u> United States Dep't of State, *Report on Human Rights Practices*, 2000. Recognizing that women are less willing to discuss abuses they suffer, the Office of International Affairs issued a memorandum instructing asylum officers on how best to interview women seeking asylum. <u>See</u> Memo. from Phyllis Coven, Immgr. & Naturalization Serv. Dir. of Off. of Intl. Affairs, to All INS Asylum Officers, Consideration for Asylum Officers Adjudicating Asylum Claims from Women (May 26, 1995). However, such interviewing techniques are seldom used and unfortunately are not required. <u>See</u> Danette Gomez, *Last in Line: The United States Trails Behind in Recognizing Gender Based Asylum Claims*, 25 WHITTIER L. REV. 959, 963 (Summer 2004).

## III. Conclusion

We affirm the BIA's determination regarding the asylum claim and the withholding of deportation claim. We vacate the BIA's order denying relief under the Convention and remand for further consideration in accordance with this opinion.

_____

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3019

_____

| | | |
|---|---|---|
| Genet Gizaw Zewdie, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Petition for Review of an Order of |
| | * | the Board of Immigration Appeals. |
| John Ashcroft, Attorney General | * | |
| of the United States, | * | [PUBLISHED] |
| | * | |
| Respondent. | * | |

_____

ORDER

_____

Counsel for respondent John Ashcroft requests the following modification of this court's decision in Zewdie v. Ashcroft, 381 F.3d 804 (8th Cir. 2004): (1) delete all references to Diallo v. INS, 232 F.3d 279, 288 (2d Cir. 2000), and (2) delete the second paragraph of footnote 7. Respondent's request for modification regarding the citations to Diallo is denied. Footnote 7 is modified to read as follows:

> [7]Zewdie did not have counsel during her interview with the asylum officer. Further, the translator had difficulty translating both the asylum officer's questions and Zewdie's responses. In addition, during oral argument, Zewdie's counsel noted Zewdie's cultural differences regarding her bodily scarring.

Ethiopian women are accustomed to abuses and have little redress within their government. See United States Dep't of State, *Report on Human Rights Practices*, 2000. Recognizing that women are less willing to discuss abuses they suffer, the Office of International Affairs issued a memorandum instructing asylum officers on how best to interview women seeking asylum. See Memo. from Phyllis Coven, Immgr. & Naturalization Serv. Dir. of Off. of Intl. Affairs, to All INS Asylum Officers, Consideration for Asylum Officers Adjudicating Asylum Claims from Women (May 26, 1995). However, such interviewing techniques are, unfortunately, not required and some have suggested asylum officers have not consistently adhered to the interviewing techniques. See Danette Gomez, *Last in Line: The United States Trails Behind in Recognizing Gender Based Asylum Claims*, 25 Whittier L. Rev. 959, 963 (Summer 2004). We do not suggest, by implication or otherwise, that the approved interview techniques were not applied in Zewdie's case.

October 21, 2004

Order Entered at the Direction of the Court:

Clerk, U.S. Court of Appeals, Eighth Circuit