# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1155

_____

Patience Njowe Esaka,                    *
                                         *
            Petitioner,                  *
                                         *    Petition for Review of an Order of
      v.                                 *    the Board of Immigration Appeals.
                                         *
John Ashcroft, Attorney General          *
of the United States,                    *
                                         *
            Respondent.                  *

_____

Submitted: November 17, 2004
Filed: February 16, 2005

_____

Before SMITH, BEAM, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Patience Njowe Esaka seeks review of an order by the Board of Immigration Appeals (BIA) affirming an Immigration Judge's (IJ) denial of her application for asylum, withholding of removal, and protection under the Convention Against Torture. We deny the petition for review.

## I. *Background*

Patience Njowe Esaka was born on October 1, 1969, in Muyuka Cameroon. In Cameroon, people fall within one of two linguistic populations: English speaking persons referred to as Anglophones, and French speaking persons referred to as

Francophones. Esaka and her family are Anglophones. Esaka began high school in 1986 at a government run school in Limbe, Cameroon. She claimed that while in high school she, along with other students, opposed the rule of Cameroon President Paul Biya. Esaka's opposition included protesting President Biya's alleged discrimination against, and persecution of, Anglophone students. Esaka claimed to have attended her first anti-government demonstration during her first year of high school where she and other demonstrators protested government tuition increases. The government responded by arresting several students and using police to disperse the crowd. Esaka avoided arrest.

Then in February 1987, Esaka protested against the government while preparing for a Youth Day celebration. Students gathered at school in the early morning to sing the Cameroon National Anthem. On one occasion, Esaka, along with other students, sang the Nigerian National Anthem in defiance of President Biya's government. School administrators punished the defiant students by assigning them to cut grass instead of attending class the following day. Instead of cutting grass, however, Esaka and other protestors initiated a demonstration that required police intervention.

According to Esaka, several students were trampled to death in the ensuing chaos. She claimed that she was arrested for disturbing the peace and taken, along with other students, to a detention camp outside of Limbe. While in detention, Esaka claimed that she was forced to sleep on the floor and given no food or water during her first day. In addition, she claimed that she was beaten with a bamboo cane and a belt, and kicked several times. On the third day, Esaka and a group of her friends escaped by tying together their shirts and bras and using them to scale the detention wall. During her escape, Esaka cut her leg on the barbed wire that topped the detention wall. Esaka asserted she then walked fifty miles back to her home in Limbe.

Although Esaka stated she feared for her life, she nonetheless returned to school the following day after receiving a statement from President Biya's government indicating that those who did not return would suffer further sanctions. When she returned to school, Esaka noticed that several of her classmates were curiously absent. Esaka heard reports that some students were forcibly removed from their homes by the Cameroon military. Due to the instability in the country, Esaka fled Cameroon with her brother to pursue her studies in the United States.

In 1987, Esaka was granted entry into the United States as a nonimmigrant student and soon joined the Cameroon Student Association (CAMSA). As a member of CAMSA, Esaka claimed to have participated in various anti-government demonstrations in the United States and asserted that President Biya's government had declared CAMSA a subversive group. Furthermore, Esaka asserted that President Biya issued warrants for the arrest of all CAMSA members and arrested, imprisoned, tortured, and/or killed many students upon their return to Cameroon.

While in the United States, Esaka also joined the Social Democratic Front (SDF) and participated in its meetings and paid dues until 1995. According to Esaka, her parents' government benefits were cut and their pay withheld in 1988 as the economic situation in Cameroon worsened. Esaka claimed that she discontinued her studies and sought employment without the permission of the United States Government because she could no longer afford to pay tuition.

In addition to her claimed personal persecution, Esaka asserted that members of her family suffered political persecution in her absence. Specifically, she alleged that President Biya's government summarily shot and killed two of her cousins during a protest in 1991. Esaka's mother produced death certificates of Esaka's deceased cousins from Cameroon. However, in response, the government produced evidence showing the certificates to be fakes. According to Esaka, one of her uncles, a leader in the SDF, was frequently arrested, had his businesses burned down by the

government, suffered beatings to the soles of his feet, and eventually went into hiding. Another uncle, an active member of the SDF, was similarly arrested, beaten, and tortured before he also went into hiding. In 1998, Esaka's father returned to Cameroon. Esaka's mother returned to Cameroon some time later.

On January 22, 1991, proceedings for deportation against Esaka commenced. An order to show cause was filed, charging Esaka with deportability for failing to maintain her student status and obtaining employment in the United States without permission. Esaka failed to appear at her hearing and was ordered deported *in absentia*. On February 18, 1992, Esaka filed an administrative asylum application with the Immigration and Naturalization Service and appeared for an asylum hearing on April 24, 1996. At the hearing, Esaka was arrested under the prior order of deportation. However, her deportation was stayed and the case reopened.

At a master calendar hearing on July 29, 1997, Esaka, represented by counsel, conceded her deportability. Nonetheless, Esaka sought asylum, withholding of removal, suspension of deportation, and voluntary departure. An IJ conducted a hearing wherein Esaka submitted evidence. The IJ denied Esaka asylum, withholding, and suspension, but granted her voluntary departure. Esaka appealed the decision to the BIA, which summarily denied her relief and ordered deportation or voluntary departure. Esaka then filed the instant action as a petition for review.

## II. *Discussion*

The BIA adopted the IJ's adverse credibility finding and ruled that Esaka failed to meet her burden of proof. When the BIA summarily adopts an IJ's decision without adding further reasoning, we limit our review to the decision produced by the IJ. *See Hassanein v. Ashcroft*, 380 F.3d 324, 327–28 (8th Cir. 2004).

## A. *Adverse Credibility Finding*

The thrust of Esaka's argument is that the IJ improperly determined her credibility. We defer to an IJ's negative credibility finding where it is "supported by a specific, cogent reason for disbelief." *Hassanein*, 380 F.3d at 327–28. "[B]ecause the [IJ] is in the best position to evaluate an alien's testimony, his or her credibility determinations are to be given much weight." *See Perinpanathan v. I.N.S.,* 310 F.3d 594, 597 (8th Cir. 2002) (citing *Estrada v. I.N.S.*, 775 F.2d 1018, 1021 (9th Cir.1985)).

The IJ first noted that Esaka resorted to misrepresentation when she considered it to be in her interest to do so. Specifically, she misrepresented her immigration status to employers in order to gain unauthorized employment. The IJ then examined Esaka's historical account of her persecution in Cameroon. The IJ noted discrepancies between Esaka's hearing testimony and her written application for asylum. In her application for asylum, she failed to mention that she had been beaten while detained. In Esaka's later testimony, however, she claimed to have been beaten with a bamboo cane and a belt, and kicked several times. Esaka explained that the discrepancy arose out of the translation of her handwritten statement into a typed statement. The IJ found the explanation "shaky" remarking that she signed the type-written document and was educated in the English language. The IJ then turned to Esaka's explanation of her detention and escape after a purported arrest for protesting President Biya's government. The IJ disbelieved Esaka's claim that she escaped from a guarded detention facility by climbing over barbed wire with ropes made from T-shirts and bras. The IJ was particularly critical of Esaka's claim that her escape was not hampered by the guards. The IJ added that Esaka's stories changed and that she gave different descriptions of the wall she escaped over.

The IJ found "most damaging" Esaka's submission of fake death certificates for her cousins.[1] After receiving the death certificates of Esaka's two cousins, the government sought to authenticate the documents by having the United States Embassy in Yaounde conduct an investigation. That investigation revealed that the death certificates were not authentic. In addition, the court noted that the death certificates were obtained by Esaka's mother who was formerly employed at the hospital purportedly issuing the certificates. The IJ noted inconsistencies in Esaka's mother's account of how she received the death certificates that further cast doubt on their authenticity.

An immigration judge can base a credibility determination on the lack of corroborating evidence if the judge also encounters inconsistencies in testimony, contradictory evidence, or inherently improbable testimony. *Zewdie v. Ashcroft*, 381 F.3d 804, 808 (8th Cir. 2004). In this case, Esaka's evidence suffered from inconsistencies. For example, her testimony about the circumstances of her departure were inconsistent and not credibly explained. In addition, the death certificates used to support her family persecution claims were determined to be fake and there were inconsistencies regarding the origin of the fake documents. The IJ, who watched Esaka give her testimony, was within his discretion to disbelieve her escape account given the improbabilities of its details.

Esaka points this court to *Zewdie*, 381 F.3d at 809, where we explained that as long as an "applicant's testimony is generally consistent, rational, and believable," inconsistencies in the testimony "need not be fatal to credibility, especially if the

---

[1]Esaka contends that the IJ violated her due process rights by allowing the government to submit evidence that the death certificates provided were fraudulent. Esaka failed, however, to make this argument to the BIA. We lack jurisdiction to hear a claim that an alien fails to raise before the BIA in the first instance. *Gebremaria v. Ashcroft,* 378 F.3d 734, 736 n.4 (8th Cir. 2004).

errors are relatively minor and isolated." (quotations omitted). In *Zewdie*, we explained that a petitioner's failure to mention beatings to an asylum officer or indicate them on her asylum application should not be conclusive as to her credibility, given the obvious translation difficulties revealed in the record. *Id.* In this case, however, there is no issue of translation difficulties; rather, it is clear that as an Anglophone, Esaka is educated in the English language. Likewise, in *Hassanein v. Ashcroft*, 380 F.3d 324 (8th Cir. 2004), we upheld an adverse credibility finding where the petitioner lied several times in connection with an application for adjustment of status, misrepresented to the Immigration and Naturalization Service the death of his father, and gave testimony regarding membership in the Socialist Labor Party that was inconsistent with a specific question asked on his application. *Id.* Here, Esaka misrepresented her immigration status to gain unlawful employment, misrepresented the death of her two cousins, and gave testimony of persecution that was inconsistent with her application for asylum.

Inconsistencies or omissions in an asylum application that relate to the basis of persecution are not minor but are at "the heart of the asylum claim." *Kondakova v. Ashcroft*, 383 F.3d 792, 796 (8th Cir 2004) (citations omitted). In Esaka's asylum application, she left out the fact that she had been beaten while she was detained. Esaka's claim of asylum is predicated on the fact that she was beaten and it clearly relates to the "heart of her asylum claim." We hold that the IJ made the adverse credibility findings based on specific, cogent reasons.

Under the Immigration and Nationality Act, the attorney general has the discretion to grant asylum to a refugee, defined as a person who is unable or unwilling to return home "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a political social group, or political opinion." 8 U.S.C. §§ 1158(b)(1), 1101(a)(42)(A). "In most cases, the critical inquiry is whether the applicant has a well-founded fear of future persecution upon return to his or her country." *Perinpanathan v. I.N.S.*, 310 F.3d 594,

597–98 (8th Cir. 2002) (citation omitted). The applicant must demonstrate a fear that is subjectively genuine and objectively reasonable. *Id.* For an alien's fear of persecution to be objectively reasonable, the fear must have basis in reality and must be neither irrational nor so speculative or general as to lack credibility. 8 U.S.C. § 1101(a)(42)(A). "The applicant is entitled to a presumption of a well-founded fear of future persecution if past persecution is established, and the burden then shifts to the INS to show by a preponderance of the evidence that 'conditions in the applicant's country . . . have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return.'" *Id.* (citing *Cigaran v. Heston,* 159 F.3d 355, 357 (8th Cir.1998)). Esaka must demonstrate that her evidence "was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *I.N.S. v. Elias-Zacarias,* 502 U.S. 478, 483-84 (1992).

Esaka failed to meet her burden of proof because the IJ found her asylum claims lacked credibility. When Esaka failed to demonstrate that she was eligible for asylum, she consequently also failed to meet the higher burden of proof required for obtaining withholding of removal. *Krasnopivtsev v. Ashcroft*, 382 F.3d 832 (8th Cir. 2004).

B. *Convention Against Torture*

Esaka also seeks reversal on her claim under the United Nations Convention Against Torture (CAT). Article 3 of the CAT establishes that "it shall be the policy of the United States not to expel, . . . or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." To receive protection under the CAT, Esaka must show that she is more likely than not to suffer torture if returned to Cameroon. *See* 8 C.F.R. § 208.16(c)(2). An IJ's adverse credibility determination and adverse decisions on asylum and withholding of removal are not determinative of the CAT claim. *Sivakaran v. Ashcroft*, 368 F.3d 1028, 1028–1029 (8th Cir. 2004). However, an IJ can properly consider a claimant's discounted credibility when

determining whether he or she will be subjected to torture. *Hassan v. Ashcroft*, 388 F.3d 661, 668 (8th Cir. 2004). A denial of relief under the Convention Against Torture is reviewed to determine whether the evidence was so compelling that a reasonable factfinder must have found the alien entitled to relief. *Ngure v. Ashcroft*, 367 F.3d 975 (8th Cir. 2004).

The code requires the IJ to consider testimony of the applicant as to past torture, the possibility of relocation within the country, mass violations of human rights, or other relevant information regarding conditions within the country. 8 C.F.R. § 208.16(c)(3). Esaka relies solely on evidence that demonstrates the general dangers present in Cameroon. She notes newspaper articles indicating that protesters are beaten, imprisoned, and murdered. She also submitted a summons for her issued in November of 1987. Torture is defined as an act by which severe pain or suffering, whether physical or mental, is intentionally inflicted, and it is an extreme form of cruel and inhuman treatment; it does not include lesser forms of cruel, inhuman, or degrading treatment. 8 C.F.R. § 208.18(a)(1), (2).

Esaka's claim lacks credible evidence of past torture as defined by the code. Presenting evidence of general conditions is insufficient to establish that one is more likely than not to suffer torture. Esaka has failed to establish that it is more likely than not that she would be tortured if she returned to Cameroon. *See Zakirov v. Ashcroft*, 384 F.3d 541, 547 (8th Cir. 2004).

For the foregoing reasons, we deny Esaka's petition for review.

_____