# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3942

_____

| | | |
|---|---|---|
| Horace Z. Gbanoe, | * | |
| | * | |
| Petitioner, | * | Petition for Review of an |
| | * | Order of the Board of |
| v. | * | Immigration Appeals. |
| | * | |
| Alberto Gonzales,* Attorney General of | * | [UNPUBLISHED] |
| the United States of America, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: November 18, 2005
Filed: December 1, 2005

_____

Before WOLLMAN, LAY, and MELLOY, Circuit Judges.

_____

PER CURIAM.

Horace Z. Gbanoe petitions for review of the Board of Immigration Appeals' (BIA) denial of his applications for asylum, withholding of removal, Convention Against Torture (CAT) relief, and voluntary departure. He argues that he has suffered past persecution and will suffer future persecution by the government of Liberia for his political opinions. We deny the petition for review.

_____

*Alberto Gonzales has been appointed to serve as Attorney General of the United States, and is substituted as appellee pursuant to Federal Rule of Appellate Procedure 43(c).

## I.

Gbanoe entered the United States in February 1997 as a visitor with authorization to remain until August 23, 1997. In May 1997, Gbanoe filed an asylum application alleging he had suffered persecution and feared future persecution at the hands of the Liberian government because of his political opinions. An asylum officer interviewed Gbanoe and his asylum application was denied. In October 1997, the Department of Homeland Security commenced removal proceedings against Gbanoe. He conceded that he is removable because he remained in the United States longer than permitted. The proceedings against Gbanoe were administratively closed in March 2000 and he was granted Deferred Enforced Departure. The proceedings were reopened in May 2002, and a removal hearing was held over two days in October, 2003.

## II.

Gbanoe is a 49-year-old native of Liberia. His wife and two teenage children live in Monrovia, Liberia. At his removal hearing, Gbanoe was the sole witness to testify on his behalf. Gbanoe testified that he gave a pro-democracy speech while he was a university student in Liberia in 1984 which led to government forces beating him, then detaining him for five days. He stated he was deprived of food and water for the first three days of this detention. He went on to testify that government officials subsequently contacted him and told him to cease speaking about democracy, and that in 1986 he was fired from his job at the government's request. He found a new job eighteen months later with a government-owned company. In 1990, Gbanoe was urged to join Charles Taylor's forces, but refused. He was told he would be put on a blacklist.

Gbanoe testified that in 1990 he attempted to escape to Sierra Leone, where his wife and children had fled, but was detained and beaten by rebels at a border

checkpoint. He eventually escaped to Sierra Leone and spent two weeks locating his wife and children, who were living at a refugee camp. He returned to Liberia in 1992 without his family and has not had any contact with them since. He testified that in 1996 he fled the building in which he was staying after it was approached by armed men. Gbanoe then obtained a passport with the help of a friend, and in December 1996 he received a visa to enter the United States.

On cross-examination, Gbanoe testified that he did not believe he had obtained a passport prior to 1996, but then confirmed that his passport was dated in 1993. He testified that the passport was not issued on that date; rather, he said it had been backdated by the government. The Immigration Judge (IJ) then gave the frivolous asylum warnings, advising him of the consequences of making deliberate false statements. In response, Gbanoe admitted he had two passports, one dated 1993 and one dated 1996. He stated that he was afraid to testify that he had two passports because he thought it was a crime to have more than one.

He also acknowledged that, on his first asylum application, he had answered "no" to the question that asks if he had ever been arrested, detained, interrogated, convicted or interrogated, or imprisoned. When asked why he mentioned only the incident at the checkpoint on the Sierra Leone border, he stated he thought he should only tell the "best" story on his application and noted that he did not have counsel when he prepared his first asylum application.

III.

Under § 208 of the Immigration and Nationality Act (INA), the Secretary of Homeland Security and the Attorney General have the discretion to grant asylum to refugees. A refugee is defined as one who can prove that he or she is unwilling or unable to return to his or her home country because of past persecution or because there is a well founded fear of future persecution because of race, religion, nationality,

-3-

membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A). If an applicant fails to establish a well founded fear of future persecution, he or she "also fails under the more stringent standard of proof required for withholding of removal." Prokopenko v. Ashcroft, 372 F.3d 941, 944 (8th Cir. 2004).

IV.

When the BIA affirms an IJ's decision without opinion, we treat the judge's decision as the final agency decision. Amin v. Ashcroft, 388 F.3d 648, 650 (8th Cir. 2004). A petitioner seeking judicial reversal of the BIA's determination must show that "the evidence he [or she] presented was so compelling that no reasonable fact finder could fail to find the requisite fear of persecution." Id. This court defers to an IJ's credibility determinations "where the finding is supported by a specific, cogent reason for disbelief." Nyama v. Ashcroft, 357 F.3d 812, 817 (8th Cir. 2004) (per curiam) (quotation and citation omitted). The BIA's factual determinations "must be upheld if supported by reasonable, substantial, and probative evidence on the record considered as a whole." Prokopenko, 372 F.3d at 944.

In a detailed written decision, the IJ outlined the "inconsistencies and implausibilities" in Gbanoe's testimony and concluded that Gbanoe's claim was "completely not credible." The IJ further noted that even if she had found Gbanoe credible, she would have denied asylum because, inter alia, Gbanoe lied to the court about how many passports he had and how he obtained them. On November 4, 2004, the BIA affirmed without opinion.

The IJ set forth fourteen specific grounds for her finding that Gbanoe lacked credibility. Although we agree with the IJ that each of the specified inconsistencies and implausibilities contribute to the conclusion that Gbanoe was not credible, we focus only on the most egregious points here. First, the IJ pointed out that, on his

-4-

asylum application and in his interview with the asylum officer, Gbanoe noted only his detention at the checkpoint on the way to Sierra Leone. This was inconsistent with his testimony that he had also been detained and beaten by the government for five days–three of which were allegedly without food and water–in 1984. The IJ acknowledged Gbanoe's claim that he thought he should tell only the "best" story, but found it implausible that he would pick the detention at the border checkpoint as the "best" story rather than the five-day detention. The IJ also noted that Gbanoe's asylum application does not mention the 1996 incident when armed men came to his apartment building, forcing him to flee.

In Kondakova v. Ashcroft, 383 F.3d 792, 796 (8th Cir. 2004), our court affirmed an IJ's credibility determination based on the fact that the applicant's asylum application did not include several of the most serious incidents the applicant testified to at her removal hearing. We observed that inconsistencies or omissions in an asylum application "that relate to the basis of persecution are not minor but are at the heart of the asylum claim." Id.; see also Esaka v. Ashcroft, 397 F.3d 1105, 1110 (8th Cir. 2005). Here, the incidents Gbanoe omitted from his asylum application go to the heart of his claims that he was persecuted for his political opinions.

The IJ also observed that Gbanoe testified inconsistently regarding when he returned to Liberia from Sierra Leone, noting that his asylum application, his interview with the asylum officer, his rebuttal affidavit, and a newspaper advertisement taken out by his wife all state that Gbanoe returned in 1993. He testified during his removal hearing, however, that he returned in 1992. The IJ further noted that Gbanoe had told the asylum officer that he left for Sierra Leone with his family in 1990, while he testified that he went alone and later located his family at a refugee camp. Although these inconsistencies, standing alone, may not be sufficient to undermine Gbanoe's credibility, they reinforce the larger credibility problems in his application as a whole.

The IJ also emphasized that Gbanoe initially testified that he had only one passport, but recanted when presented with evidence that he actually had two passports, one issued in 1993 and one issued in 1996. Gbanoe's passport contains two stamps showing that he had attempted to get a United States visa on two previous occasions, a fact Gbanoe contradicted when he testified that he could not remember having applied for a visa before 1997. Gbanoe concedes that it was a "serious error" for him to testify he had only one passport that had been backdated, but he asserts that this error was caused by "crafty interrogation rather than an effort to deceive." Further, he argues that the inconsistency in his testimony regarding his passports did not affect the substantive validity of his claims of past persecution and fear of future persecution. However, these reasons do not compel the conclusion that the IJ improperly found that Gbanoe lied to the court about his passports.

The IJ also found it implausible that Gbanoe was persecuted by the Liberian government when he was able to obtain a visa and had no trouble leaving the country. Gbanoe asserts that the IJ's conclusion that he had no difficulty leaving the country was not supported by any evidence in the record. This claim ignores the fact that Gbanoe had ample opportunity to establish the nature of any difficulties he encountered in leaving. After reviewing the record, we conclude his silence on the subject was reasonably construed by the IJ to indicate his departure from Liberia was without incident and that this fact throws into doubt Gbanoe's claim he was wanted by the government due to his political opinions.

In addition to the inconsistencies and implausibilities in Gbanoe's testimony, the IJ noted that he did not "provide[] many documents in support of his case." An IJ may require corroborating evidence when the applicant's credibility is in question. Nyama, 357 F.3d at 817. The IJ noted that Gbanoe "did not provide any letters or affidavits from people who can support his claim." This failure provided additional reason for the IJ to doubt Gbanoe's claim of persecution.

Having reviewed the specific, cogent reasons the IJ presented in the context of the record as whole, we conclude that substantial evidence supports the IJ's finding that Gbanoe was not credible. Specifically, the omissions, inconsistencies, and implausibilities throughout Gbanoe's application and testimony, when considered in light of his failure to provide corroborating evidence, support the IJ's denial of Gbanoe's asylum application. Gbanoe's failure to demonstrate that he was eligible for asylum mandates the conclusion that he also failed to meet the higher standard required to succeed on his withholding of removal claim. See Esaka, 397 F.3d at 1111.

In his appeal to this court, Gbanoe advances no specific arguments regarding the IJ's denial of his request for CAT relief. In order to receive CAT relief, Gbanoe must show that he is more likely than not to suffer torture if returned to Liberia. 8 C.F.R. § 208.16(c)(2). We note that "[a]n IJ's adverse credibility determination and adverse decisions on withholding of removal are not determinative" of the applicant's CAT claims. Esaka, 397 F.3d at 1111. However, an IJ can properly consider the credibility of the applicant when determining whether it is more likely than not the applicant will be tortured upon returning to his or her native country. Id. Gbanoe's claim lacks credible evidence that he faces the likelihood of torture if he returns to Liberia.

For the foregoing reasons, we deny Gbanoe's petition for review.
_____