# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3808

_____

Martin Damkam,          *
         *
         Petitioner,          *
         * Petition for Review of an Order
      v.          * of the Board of Immigration
         * Appeals.
Eric H. Holder, Jr., Attorney          *
General of the United States,          *
         *
         Respondent.          *

_____

Submitted: September 22, 2009
Filed: January 15, 2010

_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Martin Damkam petitions for review of a decision by the Board of Immigration Appeals ("BIA") denying his application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Damkam contends that the BIA erred in affirming the Immigration Judge's adverse credibility finding. We deny the petition.

## I.

Damkam, a native and citizen of Cameroon, entered the United States in October 2003 on a visitor's visa. He was authorized to remain until April 24, 2004, but stayed beyond that date. In May 2004, Damkam applied for asylum, withholding of removal, and protection under the CAT, claiming that if he were returned to Cameroon, he would be persecuted on account of his political opinion. The Department of Homeland Security ("DHS") reviewed Damkam's application and, on October 18, 2004, commenced removal proceedings against him pursuant to 8 U.S.C. § 1227(a)(1)(B). DHS referred his application to an immigration judge ("IJ").

In an affidavit accompanying his application, Damkam specified that his membership in the Social Democratic Front ("SDF"), an opposition party in Cameroon, had led to torture and threats against him and his family. Damkam said that he was arrested and tortured in 1992 and again in 2002. He also alleged that he received two threatening calls between July 2002 and April 2003, and that his house was searched twice by the police in May 2003. Damkam claimed that on June 12, 2003, he was summoned to a "special police station," where the police interrogated him for four hours and accused him of sabotaging the ruling political party. Damkam said that these experiences caused him to go into hiding and flee to the United States.

Damkam conceded removability before an IJ in November 2004, and renewed his request for asylum, withholding of removal, and protection under the CAT. Damkam originally filed his claim in Baltimore, but on January 11, 2006, he filed a motion for a change of venue to St. Louis. The motion, which was granted the day it was filed, was accompanied by a letter from Pascal Damkam stating that he and petitioner were brothers, and that petitioner had relocated to Missouri to live with him.

On August 21, 2006, Damkam appeared before an IJ in St. Louis for a hearing on the merits of his claims. Damkam testified that he had joined the SDF in 1992 to

bring political change to Cameroon. He stated that he was not a leader in the party, but a "militant" who helped to organize meetings. Damkam testified in detail about two instances of alleged persecution that he also referenced in his written application.

The first incident occurred on November 12, 1992, when Damkam was allegedly protesting the results of a "stolen" presidential election with other SDF members in Doula, Cameroon. Damkam claimed that the police used tear gas to disperse the protesters, and that he had been arrested. Damkam said that he was detained in a cell at the central police station for nearly two weeks and was beaten day and night before his release.

Damkam testified that he continued his active involvement in the SDF despite this initial arrest. He stated that he had no other incidents with the police until a second arrest on May 20, 2002, while he was protesting to demand that the government accept a list of SDF candidates for upcoming municipal and legislative elections. According to Damkam, the police again used tear gas on the protestors and detained him at a police station. He claimed that for six days, the police starved, tortured, and interrogated him at the urging of Ms. Françoise Foning, a leader in Cameroon's ruling political party and Damkam's employer at the time.

Damkam testified that he began working as Foning's driver in February 1999, but that she did not know about his SDF membership. He alleged that he was supposed to be driving Foning at the time of his arrest, and when she became aware that his absence was the result of his involvement with the opposition, she demanded that the police torture him. Damkam said that on the sixth day of alleged mistreatment, he fell from a torture device used by the police called "la balançoire"[1]

---

[1]French for "the swing," this device is described in a report submitted by DHS as one in which torture "victims were hung up-side-down with their hands tied together and beaten." Immigration and Nationality Directorate, U.K. Home Office, *Report of Fact-Finding Mission to Cameroon* 6.9 (2004).

and broke his arm. According to his testimony, a family member visiting the jail bribed the police to allow Damkam to receive treatment at a hospital, where he remained for eighteen days. He was allegedly released from the hospital upon signing an agreement to cease all activities with the SDF.

On cross-examination, Damkam stated that he obtained a visitor's visa to come to the United States on July 31, 2003, but did not leave Cameroon until October 23, 2003. He testified that he delayed his departure so that his family could ensure his safe travel to the airport. He also said that all his immediate family members, including his parents and five brothers, reside in Cameroon and are active in the SDF, but have not been harmed by the police. Similarly, Damkam testified that his wife and children had not been harmed since his departure. He reported, however, that in 2005 his home had been searched by police looking for documents that they suspected he stole from Foning. He also said that his wife had been summoned to a police station in December 2005 and January 2006 to provide information on his whereabouts.

On examination by the IJ, Damkam revealed that the person with whom he lived in Missouri was not his brother, as stated in his motion for a change of venue, but a cousin whom he regarded as a brother. Damkam said that although this cousin was aware of his involvement in the SDF, Damkam had not asked the cousin to testify because he did not think it would matter. Damkam also said that he knew his supporting witness, Alexander Taku, only from afar in Cameroon, because of Taku's position as the third-highest ranking member of the SDF, but reported that he had interacted with Taku in the United States beginning in May 2004.

Taku, the SDF National Secretary for Political Education and Training, also testified at the hearing. He said that he had been asked by SDF party leadership to testify on Damkam's behalf. Taku reported that he did not know Damkam in Cameroon, but had learned about him through investigations by his party and information he had gathered while in the United States. Taku stated that it was "an

open secret" that Damkam had served as an informant for the SDF while working as a driver for Foning. Taku opined that given Damkam's betrayal of Foning, a powerful political leader with an alleged history of atrocities, Damkam's life would be in danger if he returned to his home country. Taku also testified that in June 2002, a "convocation," or summons, was issued for Damkam to report to the police station in Cameroon for arrest, and that this summons remained in effect. Finally, Taku stated that he had last seen Damkam before the hearing on August 4, 2006, at an SDF meeting in Washington, DC, when Damkam confirmed with Taku that he would testify on his behalf.

On March 21, 2007, the IJ denied Damkam's application for asylum on credibility grounds, concluding that Damkam's "testimony not only lacked detail, but also was inconsistent with his own application for relief, with his supporting documents, and the testimony of his witness." The IJ set forth a series of inconsistencies and omissions that undermined Damkam's credibility, including Damkam's failure to mention his alleged role as an SDF informant in his testimony.

The IJ also concluded that even if Damkam had provided credible testimony, he would not have established eligibility for asylum. The IJ cited the long gap in time between Damkam's arrests, the three-month delay between the issuance of his visa and his departure from Cameroon, the lack of persecution suffered by his family members who are actively involved in the SDF, and the recent electoral success of six SDF mayoral candidates in Damkam's home province as reasons why Damkam did not have a well-founded fear of persecution in Cameroon. The IJ thought it questionable that Damkam had not submitted corroborating testimony from the cousin who allegedly was aware of Damkam's arrests and detentions in Cameroon, and suspicious that Damkam did not submit his SDF identification card in time for forensics examination that could have corroborated Damkam's testimony. While recognizing that corroboration is not required to establish persecution, the IJ found that the lack of corroboration, "in combination with [Damkam's] weak and vague

overall claim," undermined Damkam's claim for asylum. The IJ then held that given the lack of credible evidence for asylum, Damkam necessarily failed to meet the higher standard required for withholding of removal. Finally, the IJ denied Damkam protection under the CAT, because the evidence failed to show a likelihood of torture if Damkam were returned to Cameroon.

The BIA adopted and affirmed the decision of the IJ, with some additional reasoning. The BIA observed that the IJ's adverse credibility finding was "sufficiently supported by the record," and determined that Damkam, who did not specifically contest any of the inconsistencies enumerated by the IJ, failed to show that the finding was clearly erroneous. The Board also affirmed the IJ's finding that Damkam had failed to provide corroborative evidence concerning his experiences in Cameroon, noting that "the weaker the alien's testimony, the greater the need for corroborative evidence." *See In re Y-B-*, 21 I&N Dec. 1136, 1139 (BIA 1998). The BIA also agreed with the IJ that Damkam had not shown a sufficient likelihood of torture if returned to his home country.

## II.

Damkam challenges the BIA's decision concerning his request for asylum, withholding of removal, and relief under the CAT. "When the BIA adopts and affirms the IJ's decision, but also adds reasoning of its own, we will review both decisions together." *Chen v. Mukasey*, 510 F.3d 797, 800 (8th Cir. 2007). We review the BIA's decision for substantial evidence on the record as a whole, *Menendez-Donis v. Ashcroft*, 360 F.3d 915, 918 (8th Cir. 2004), and will not disturb its findings of fact "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1, 483-84 (1992).

The Attorney General may grant asylum to an alien who is unwilling to return to his home country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *Singh v. Gonzales*, 495 F.3d 553, 556 (8th Cir. 2007); *see* 8 U.S.C. § 1158(b)(1); *id.* § 1101(a)(42)(A). "To establish a well-founded fear of future persecution, the alien must show that he subjectively fears persecution, and that there is credible, direct, and specific evidence that a reasonable person in the alien's position would fear persecution if returned to the alien's country." *Mamana v. Gonzales*, 436 F.3d 966, 968 (8th Cir. 2006).

To qualify for withholding of removal, an applicant must demonstrate a "clear probability" that "his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 1208.16(b); *see also* 8 U.S.C. § 1231(b)(3). An alien seeking relief under the CAT must demonstrate that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).

Damkam challenges the IJ's adverse credibility determination, arguing that the findings are not supported by "specific, cogent reasons for disbelief." [Appellant's Br. at 9]. The law requires that the IJ's reasons must be "specific enough that a reviewing court can appreciate the reasoning behind the decision," but there is no additional requirement of specificity. *Singh*, 495 F.3d at 557. A credibility determination is a finding of fact, and the statute provides that we must uphold it "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also Mamana*, 436 F.3d at 968. There is no greater

requirement of cogency beyond the § 1252(b)(4)(B) standard. *Singh*, 495 F.3d at 558.[2]

We conclude that the IJ and BIA offered a sufficient explanation for the finding that Damkam was not credible, and that the record does not compel a contrary finding. The IJ cited several inconsistencies and omissions in the record, implausible testimony, and an absence of corroboration that reasonably justified a finding that Damkam's claims were not credible.

First, while Taku, Damkam's supporting witness, testified at length about the grave danger that Damkam would face from retribution that Foning, an allegedly "vicious" politician, would seek against her former employee, Damkam failed even to mention in his testimony and his written application that he allegedly served as an SDF informant while working as Foning's driver. The IJ observed that Damkam's informant status "would have served to be the strongest ground for a well-founded fear of prosecution," but that Damkam did not even raise the issue. This central omission reasonably led the IJ to conclude that Damkam was not actually an SDF informant and called into question the remainder of Damkam's testimony. *See Esaka v. Ashcroft*, 397 F.3d 1105, 1110 (8th Cir. 2005); *Kondakova v. Ashcroft*, 383 F.3d 792, 796 (8th Cir. 2004).

Damkam contends that he did discuss his work as an informant when he testified before the IJ that Cameroonian police officers had searched his house in 2005 for documents they believed he had stolen while working as Foning's driver. But this hearing testimony, at most, was an ambiguous, indirect reference to the most essential

---

[2]The Real ID Act of 2005 includes a provision governing credibility determinations, 8 U.S.C. § 1158(b)(1)(B)(iii), but this provision applies only to applications made after May 11, 2005. Pub. L. No. 109-13, § 101(h)(2), 119 Stat. 231, 305. Because Damkam made his application before this date, the new statute does not apply.

element of Damkam's asylum claim. The testimony is not sufficient to show that any reasonable adjudicator must have construed it as Damkam suggests, and believed that he actively worked as an SDF informant while in Foning's employ. That Damkam made no mention of his alleged SDF informant status in his written application, moreover, lends further support to the adverse credibility finding of the IJ and the BIA. *See Mohamed v. Ashcroft*, 395 F.3d 835, 836-37 (8th Cir. 2005) (upholding an IJ's credibility finding where "crucial portions of [the alien's] claim appeared for the first time at the asylum hearing").

A second discrepancy between the statements of Damkam and Taku concerned the summons allegedly issued for Damkam to report to the police station. Taku testified that after Damkam's release from the hospital following his second arrest, Damkam was summoned to return to the police station in June 2002. Taku explained that because Damkam did not appear in response to this summons, he would be arrested upon returning to Cameroon. Although this risk of arrest bears directly on Damkam's fear of persecution, Damkam failed to mention the summons in his testimony or his application.

Damkam argues that Taku performed an independent investigation of the facts, and that "[t]here is nothing in the record to support a finding that Mr. Damkam was aware of being summoned to the police station." But Taku's own testimony contradicts Damkam's argument, for Taku explained that "the police invited [i.e., summoned] him and *then he [i.e., Damkam] said he escaped*." It was reasonable to conclude that Damkam would not say that he "escaped" from police if he was unaware of the summons. The IJ's conclusion that Damkam must have known of the June 2002 summons is further supported by Taku's testimony that several summonses were delivered to Damkam's home and to the SDF party office months before Damkam's departure to the United States in October 2003. That Damkam was interrogated by police and released in June 2003, together with Damkam's failure to mention fear arising from the 2002 summons, bolsters the IJ's conclusion that there was no well-

founded fear of a future arrest based on a summons that pre-dated the most recent police encounter.

The IJ and the BIA also reasonably relied on conflicting accounts of the interaction of Taku and Damkam before the hearing. The IJ noted that Damkam had testified that he only knew Taku in Cameroon from afar "as a militant," and he mentioned only his first meeting with Taku in the United States at a celebration at the Cameroonian Embassy in 2004. Taku, by contrast, testified about more frequent contact between the two men, including an SDF meeting on August 4, 2006, at which Damkam confirmed that Taku would testify on his behalf. Damkam's failure to mention this important meeting when questioned about his previous interaction with Taku supports the inference that some evidence may have been exaggerated or manufactured to support the claim for asylum.

In addition to discrepancies, the BIA permissibly cited aspects of Damkam's testimony that it deemed implausible. *See Mamana*, 436 F.3d at 968. Damkam claimed in his written application that shortly after Foning caused him to be tortured by police in May 2002, he contacted Foning to obtain back wages. The IJ justifiably could not "fathom how [Damkam] could have a well-founded fear of persecution when he voluntary contacted his persecutor." The IJ also cited suspicious testimony about Damkam's relationship with a relative in Missouri. In his change of venue request, Damkam stated that the man was his brother, but upon questioning at the hearing, Damkam conceded that the man was actually his cousin. Even accounting for potential cultural differences in the use of the term "brother," we cannot declare unreasonable the IJ's conclusion that the inaccurate characterization of this relationship in official proceedings "sheds doubt on [Damkam's] sincerity."

Given the weakness of Damkam's claim, it was reasonable for the BIA to cite the absence of corroborating testimony as a factor in its decision. Damkam testified that he kept his SDF membership card with him "very securely," but curiously could

not produce it in time for forensic testing before his hearing.  And Damkam failed to produce the "brother" or "cousin" with whom he resided in Missouri to corroborate alleged encounters with police in Cameroon.

Because the record does not compel a finding that Damkam presented credible testimony, we uphold the determination of the BIA on that point.  Without credible testimony to demonstrate past persecution or a well-founded fear of future persecution, Damkam's asylum claim must fail.  *Singh*, 495 F.3d at 559.  The denial of Damkam's asylum claim dictates the same outcome on his claims for withholding of removal and relief under the CAT, which are based on the same underlying factual allegations.  *See Alemu v. Gonzales*, 403 F.3d 572, 576 (8th Cir. 2005).

\*          \*          \*

For the foregoing reasons, the petition for review is denied.

_____