# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3304

_____

| | | |
|---|---|---|
| Selamawit Kifleyesus, | * | |
| | * | |
| Petitioner, | * | |
| | * | Petition for Review of an Order of |
| v. | * | the Board of Immigration Appeals. |
| | * | |
| | * | |
| Alberto Gonzales, Attorney General of | * | |
| the United States, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: June 16, 2005

Filed: September 12, 2006

_____

Before MURPHY, MELLOY, and COLLOTON, Circuit Judges.

MELLOY, Circuit Judge.

Selamawit Kifleyesus, an Eritrean citizen, petitions for review of an order of the Board of Immigration Appeals. In the order, the Board found that she was not credible; denied her application for asylum, withholding of removal and relief under the Convention Against Torture; and found that her application was frivolous. We deny the petition.

I.    Background[1]

       The petitioner entered the United States at Detroit on July 6, 2000, on a 90-day nonimmigrant fiancé visa.  She was authorized to stay in the United States through October 5, 2000.  She did not marry her fiancé, and she overstayed her visa.  On July 17, 2001, the INS served the petitioner with a notice to appear charging removability.

       In a first hearing, on September 27, 2001, the petitioner conceded removability and sought asylum, withholding of removal, relief under the Convention Against Torture and, in the alternative, voluntary departure.  The IJ designated Eritrea as the country of removal.

       On January 7, 2004, the IJ held another hearing, received evidence, permitted the petitioner to amend her asylum application, and received testimony from the petitioner.  The petitioner amended her asylum application regarding her education, employment, and places of residence in the United States.  She then declared and swore that contents of the application were true.  The petitioner did not amend several

_____

       [1]The record in this case is a mix of admittedly false statements, statements that an immigration judge ("IJ") rejected as false but that the petitioner maintains are true, and explanations from the petitioner for the false statements.  The explanations for the false statements are based on the assertion that the petitioner was raped by a police officer in Sudan while displaced from her native Eritrea and that she was eventually mistreated and abused by her fiancé in the United States.  The petitioner claims that her situation as a rape victim and a victim of domestic abuse made her particularly dependent upon, and subject to manipulation by, the fiancé, and that all false statements and omissions in her application and testimony are attributable to his advice and her desire not to disclose the rape.  Based on this record, the IJ made some express findings of fact, but did not clearly articulate findings as to every aspect of the petitioner's history.  Accordingly, we find it necessary to describe the evidence as it was presented to the IJ and to discuss the infirmities that the IJ identified in petitioner's evidence.

items on her asylum application even though she later admitted that these items were false.

In her testimony at the January 7, 2004 hearing, the petitioner described the following history. She is an Eritrean citizen who was born in an area of Ethiopia that eventually became Eritrea. She left the country with her family in 1978, at the age of eight, during a time of civil war. The family fled to Kassala, Sudan where the petitioner spent the remainder of her childhood and graduated from high school. She received her education in schools run by members of a political group, the Eritrean Liberation Front ("ELF"). Her parents were members of the ELF, and she eventually joined and became active in the group. In 1988, after high school, she moved to Khartoum, Sudan, received vocational training, and obtained a job as a secretary at a YMCA. She worked in that capacity for three years. The petitioner's family returned to Eritrea in 1992 when Eritrea obtained its independence from Ethiopia. The petitioner remained in Sudan.

While in Sudan, she met a man named Mehretab Abraha. Mr. Abraha moved to Egypt to attend college and eventually moved to the United States and became a United States citizen. The petitioner stated she remained in Sudan until November 1996, at which time she returned to Eritrea and lived in hiding until April 1998. She did not explain what she did between the time that she stopped working as a secretary in Khartoum and the time that she returned to Eritrea in 1996. She left Sudan for Eritrea in order to procure an Eritrean passport so she could travel to the United States to marry Mr. Abraha.

The petitioner claimed that while in Eritrea between 1996 and 1998, she lived in hiding because her active participation in the ELF made her a target of the Eritrean government. She did not, however, claim that her mother lived in hiding or was targeted for having previously been active with the ELF. The petitioner also claimed that she feared harm from the government of Eritrea and could not obtain an Eritrean

-3-

passport or identification card due to her failure to participate in compulsory national service. She does not claim that she actually suffered any harm during that time.

She claimed that, in April 1998, she fled to Ethiopia where she lived in hiding for six months with an uncle and attempted to obtain an Ethiopian passport. Eventually, the uncle arranged for a passport and travel to Germany with a Somali businessman. She then traveled to Germany where she lived from September 1998 until July 2000. While there, she met other Eritreans and became active in a local branch of the ELF. She applied for an Eritrean passport at the Eritrean embassy, but her application was denied. She applied for and was denied asylum in Germany. She did not state why Germany denied her application for asylum. She claimed to have filed an appeal of the German decision but to have withdrawn the appeal in order to obtain German travel documents that would allow her to join Mr. Abraha, by then her fiancé, in the United States. The petitioner testified that she and Mr. Abraha originally had planned to marry in Germany before she traveled to the United States, but that he changed the plan after she arrived in Germany and decided instead to apply for a fiancé visa for her admission to the United States.

When she arrived in the United States, she stayed with Mr. Abraha's sister. She stated that Mr. Abraha refused to marry her and instead insisted that she marry his older brother. She claimed that when she refused to marry his brother, Mr. Abraha became angry, held her down, tied her in rope, demanded that she give him her documents and photos, and then forcefully took her photos and documents. In fact, she filed a domestic violence complaint against him and obtained a protective order from law enforcement in Minnesota. The immigration judge noted at the January 7 hearing that she had read the materials and the order arising from the domestic violence complaint.

The petitioner then stated that she was active in the ELF in Minnesota and had participated in numerous ELF events throughout the United States. She also described

-4-

the basis for her fears of persecution if returned to Eritrea. She claimed her nephew lives in hiding with her mother and sleeps on the roof to avoid detection from officials who come looking for him every morning. She also claimed that her brother and brother-in-law were forced to participate in national service in Eritrea. She did not claim that only ELF members were forced into service. Instead, she admitted that all Eritreans within a certain age range are required to participate in national service. She identified national service as a reason she did not want to return to Eritrea. She stated that the government of Eritrea knew of her participation in the ELF outside Eritrea and that the government of Eritrea indefinitely detained and killed ELF members.

At the hearing, the IJ had in her possession letters and supporting evidence received from Mr. Abraha. These letters accused the petitioner of lying in the asylum application. In particular, the letters contradicted the petitioner's claims about her past countries of residence, her allegiance to the Eritrean government, and her claim that Mr. Abraha had called off the engagement. Mr. Abraha's letters stated that the petitioner had not lived in Sudan for the entire period claimed, but rather, had lived in Doha, Qatar from 1993 to 1998 under the assumed Islamic name Selma Hiyabu. Supporting documents included a cancelled check, envelopes from Selma Hiyabu, a "free of marriage" contract for the petitioner obtained from the government of Eritrea, and a birth record and census and civil status documents from Eritrea. Letters from Mr. Abraha accused the petitioner of refusing to marry him and of having an affair with an Eritrean man that she met in Germany. The letters stated that she traveled to Germany via Italy and Mr. Abraha had paid for her travel.

The IJ asked the petitioner if she had ever lived in Italy or Qatar or heard the name Selma Hiyabu. The petitioner answered no. The IJ then explained the letters and documents that were in the file. It was unclear whether the materials had any basis in fact or whether Mr. Abraha had submitted them as an act of vindictiveness in relation to the earlier domestic violence claim. Accordingly, the IJ continued the hearing to permit the petitioner time to review the materials.

At a third hearing, on March 18, 2004, the petitioner revised her claims regarding her personal history and admitted that aspects of her prior testimony and application were false. She stated she was raped in Sudan by a police officer when she was briefly incarcerated. She stated she felt unsafe after the rape and decided to leave Sudan. She did not report the crime due to fear of another assault by the police. Also, she told no one other than Mr. Abraha that the rape had occurred. She stated that she feared returning to Eritrea because of her affiliation with the ELF and because she was opposed to participating in mandatory national service in Eritrea. In the asylum proceedings, she had not previously disclosed the fact that she had been incarcerated in Sudan.

She then stated that, through an employment agency, she obtained work as a nanny and domestic servant for a royal family in Qatar and traveled to Qatar on a Ethiopian passport in 1993 under the assumed name, Selma Hiyabu. She lived in Qatar and worked for the family until 1998. She claimed that she returned to Eritrea briefly between May and September 1996, when she lived in hiding and attempted to obtain an Eritrean passport but was denied due to her refusal to participate in national service. She claimed that she had heard stories of women being sexually abused while in national service or returning from national service pregnant. She explained that she lied on her United States asylum application and in the prior hearing because Mr. Abraha had told her she would be denied asylum if she admitted to having lived in Qatar.

She explained her journey from Qatar to the United States was an effort that she undertook at the instruction of Mr. Abraha. She admitted that she had not lived in Ethiopia immediately before traveling to Germany, but rather, had traveled with the Qatari family to Germany and fled from them at the airport. She also explained that, through a series of letters in 1995, the petitioner and Mr. Abraha agreed to marry and that he believed it would be easier to marry in Germany than Qatar since he was a Christian and Qatar was a Muslim nation. She also explained that her mother was able

to obtain the birth certificate and "free of marriage" certificate from Eritrea. She claimed that Mr. Abraha had taken these documents from her during the episode of domestic violence and had not returned them.

The petitioner claimed that the only thing she had failed to disclose in her asylum application was the fact that she had lived in Qatar. The petitioner denied having traveled to Germany via Italy, although a Western Union receipt suggested that she had received money from Mr. Abraha consistent with his claim to have provided money for an airline ticket from Italy to Germany. When pressed by the IJ for evidence or corroboration of her claim regarding Mr. Abraha's demand that she marry his brother, the petitioner stated that she had no corroborating evidence. She claimed that she had wanted to marry Mr. Abraha and that if she didn't want to marry him, she could have married "the guy in Germany when he asked me."

The petitioner also admitted that she had spent two weeks in Eritrea in 1992 at the time that her father died. She then admitted that national service did not begin until 1994 and that she did not encounter difficulty during her visit in 1992. She also admitted that she obtained an Eritrean national ID and voted in 1993. In addition, she stated that her nephew has lived with her mother since 1992 and has not participated in national service. Although the petitioner initially stated that government officials came to her mother's house every morning to look for the nephew, she later stated that they only visited "once in a while." She stated that the nephew had been eligible for service for two years. She claimed initially that the Eritrean government would know of her participation in the ELF because she participated in demonstrations that were video-taped. She later stated, however, that she did not know if the government had knowledge of her participation in ELF activities since 1993.

The petitioner stated that she could not seek asylum in Qatar because she was merely brought there to work and was not allowed to leave the employing family's compound. There was, however, documentary evidence regarding her receipt of a

funds transfer at a money exchange in Doha, Qatar, suggesting that she could move about outside the employing family's compound. She admitted that when she traveled to Eritrea in 1996, she did so on a false Ethiopian passport and that she stopped in Dubai and got off the plane in Dubai, but did not apply for any form of protected status in that country.

The IJ then asked her about her German asylum application. The petitioner stated that she failed to disclose the rape in the German application, that she did have a copy of the German application, and that she didn't provide it in her United States immigration proceedings because she didn't know it was important. She stated that she had been in possession of the German application for three years. The IJ then continued the hearing to permit translation of the German application. The IJ refused the petitioner's request to have certain witnesses testify, holding that their testimony would be redundant with affidavits and other testimony.

A fourth hearing was held on April 19, 2004. At that time, the Department of Homeland Security requested a finding that the petitioner's application for asylum was frivolous. In her testimony at this hearing, the petitioner stated that the reason she could not obtain an Eritrean passport in 1992, following her alleged rape in Sudan, was that Eritrea was not yet an independent country. She also elaborated on her travel to, and time spent in, Germany. She explained that she fled from the employing family at the airport in Germany, met an Eritrean man, and with his aid, established contact with one of her sister's in-laws, with whom she stayed. She explained further that Mr. Abraha advised that they marry in Germany, but she didn't have the necessary papers and she applied for asylum in Germany while waiting to obtain the appropriate documents from Eritrea. She admitted that she lied in her German asylum application about living in Ethiopia and claimed that Mr. Abraha had advised her to lie. She also elaborated on the Minnesota domestic violence incident and admitted that she claimed in the domestic violence proceedings that Mr. Abraha had wanted to continue the relationship with her.

The IJ expressed clear frustration with the false statements the petitioner had made. She ultimately found the petitioner non-credible and denied all relief based on this credibility finding. In the alternative, the IJ found that there was no evidence of past persecution and no evidence to support the petitioner's claimed fear of future persecution if returned to Eritrea. Based on the credibility assessment and the fact that the petitioner had received warnings throughout the immigration proceedings regarding the consequences of filing a frivolous application, the IJ found the application frivolous. In making the credibility assessment, the IJ expressly rejected the findings set forth in the opinion that accompanied the protective order related to the domestic violence in Minnesota. The IJ stated that she did not believe that Mr. Abraha had called off the marriage or that he had tied the petitioner in rope. Rather, the IJ found that the record "reflected that it was the respondent who didn't go through with the marriage after Mr. Abraha brought her to the United States."

The petitioner appealed to the Board of Immigration Appeals. The Board found that the IJ's credibility finding was "not clearly erroneous." The Board stated:

> We particularly note that the respondent's admitted dishonesty regarding living in Qatar for several years would implicate facts bearing on her eligibility for asylum. For example it bears directly on her original claim of having lived in fear and hiding in Eritrea for a year and a half and in Ethiopia for 5 months, an integral part of her overall story, when she was really living in safety in Qatar during that period with a stay of only 3 months in Eritrea.

The Board proceeded to expressly adopt the IJ's finding that the application was frivolous.

In her petition to our court, the petitioner presents explanations for her false statements. She states that all of the false statements were made in an effort to construct a coherent story that would eliminate the need to disclose or talk about the rape in Sudan. She also stresses the degree to which Mr. Abraha held sway over her

actions. She argues that her false statements were not material and that she is entitled to relief. In support of her arguments, she presents affidavits from psychologists who describe the impact of the rape and the petitioner's dependancy on Mr. Abraha.

II.    Discussion

We have repeatedly stated that we owe considerable deference to the credibility assessments of immigration judges. See Mamana v. Gonzales, 436 F.3d 966, 968 (8th Cir. 2006) ("[A]n IJ's adverse credibility findings 'are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'") (quoting Turay v. Ashcroft, 405 F.3d 663, 668 (8th Cir. 2005)); Ibrahim v. Gonzales, 434 F.3d 1074, 1079 (8th Cir. 2006) ("We defer to the IJ's findings regarding the petitioner's credibility if those findings are supported by specific, cogent reasons."). Here, the credibility assessment enjoys sufficient explanation and support.

There are two possible interpretations of the record in this case. The one urged by the petitioner is that she was a repeat victim of abuse whose false statements were the product of bad advice dispensed by an abuser who held a position of control over her actions. Under this view of the facts, the petitioner endured a life of hardship, finally arrived in the United States, and was abused by the man she intended to marry after he inexplicably demanded that she marry his brother. The other interpretation, the one adopted by the Board, is that the petitioner is a woman who repeatedly demonstrated independence, arrived in the United States, refused to marry her fiancé, and spun a false tale of living in hiding to exaggerate her fear of persecution. Although we are not unsympathetic towards the petitioner and although her explanation enjoys some support, the interpretation adopted by the IJ and the Board is adequately supported by the record, and as such, we must accept the Board's interpretation, credibility assessment, and denial of relief. 8 U.S.C.A. § 1252(b)(4)(B); INS v. Elias-Zacarias, 502 U.S. 478, 481 & n.1 (1992) (mandating that we accept the Board's findings unless the record "compels" the opposite result).

-10-

Aside from the issue of credibility, we note that the IJ's independent finding of no past persecution nor likelihood of future persecution is supported by the record. The petitioner experienced no harm at the hands of Eritrean officials or sympathizers, much less persecution due to a protected basis. Further, her claimed fear of future persecution related to speculative general allegations regarding the treatment of ELF supporters, and she admitted that she did not know if the government of Eritrea was aware of her participation in the ELF since 1993. Finally, her claimed fear of future persecution also related to her desire to avoid national service. The petitioner's desire to avoid compulsory service is not a valid basis for finding a fear of future persecution because the compulsory service in this case is unrelated to a protected basis such as race, religion, or political opinion. See, e.g., Elias-Zacarias, 502 U.S. at 481-83; Dominguez v. Ashcroft, 336 F.3d 678, 680 (8th Cir. 2003) (rejecting an asylum claim where "guerillas were simply trying to fill their ranks and were not concerned with [the petitioner's] political beliefs").

The more difficult issue we face is whether it was appropriate for the Board to find the petitioner's asylum application frivolous. Section 208(d) of the Immigration and Nationality Act (the "Act"), 8 U.S.C. § 1158(d), as amended by the Immigration Reform and Immigrant Responsibility Act of 1996, provides that if an asylum applicant receives notice, inter alia, of the consequences of filing a frivolous asylum application, and if the attorney general subsequently determines that the applicant knowingly filed a frivolous application, the applicant "shall be permanently ineligible for any benefits under this chapter." Id. § 1158(d)(4), (6). Regulations promulgated under the Act explain with more particularity what is meant by the term "frivolous." 8 C.F.R. § 208.20 provides:

> [A]n asylum application is frivolous if any of its material elements is deliberately fabricated. Such finding shall only be made if the immigration judge or the Board is satisfied that the applicant, during the course of the proceedings, has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim.

-11-

The Second Circuit recently addressed the issue of frivolousness, described the requirements for a showing of frivolousness, and reviewed the limited authority from other circuits interpreting this regulation. Liu v. U.S. Dept. of Justice, 455 F.3d 106, 117-18 (2d Cir. 2006) (remanding to the Board with instructions to identify the standards used to find an application frivolous). The Liu court noted that the regulation identifies three separate elements for a finding of frivolousness: "an alien has (1) 'deliberately fabricated' (2) a 'material' element of his asylum application, and (3) has been given a 'sufficient opportunity' to address the perceived problems with his claim." Id. at 113 (quoting 8 C.F.R. § 208.20).

Beyond the text of the regulation, the Second Circuit in Liu identified three "emergent standards" for finding applications frivolous. Id. at 113-15. First, the court noted that in the Third and Eleventh Circuits, more than an adverse credibility finding is needed to support a finding of frivolousness. Id. at 113; Scheerer v. U.S. Att. Gen., 445 F.3d 1311, 1318 (11th Cir. 2006); Muhanna v. Gonzales, 399 F.3d 582, 589 (3d Cir. 2005). Next, the court noted that in the Ninth Circuit a petitioner must be given a "sufficient opportunity to account for" the *specific concerns* upon which the finding of frivolity rests. Liu, 455 F.3d at 113-14 (quoting 8 C.F.R. § 208.20); Farah v. Ashcroft, 348 F.3d 1153, 1158 (9th Cir. 2003). Finally, the court reviewed the facts of several cases in which circuit courts affirmed findings of frivolousness. Liu, 455 F.3d at 114-15. Based on those affirmances, the court suggested that mere "garden-variety inconsistencies," id. at 115, could not justify a finding of frivolousness, but instead, "concrete and conclusive evidence of fabrication is needed to warrant a ruling that renders an alien permanently ineligible for immigration benefits in the United States." Id. at 114; c.f. Ignatova v. Gonzales, 430 F.3d 1209, 1214 (8th Cir. 2005) (upholding a finding of frivolousness where a hospital identified medical records submitted by the petitioner as fraudulent); Selami v. Gonzales, 423 F.3d 621, 626-27 (6th Cir. 2005) (upholding a finding of frivolousness where a comparison of copied documents provided by a petitioner to true copies of the original documents

demonstrated convincingly that the petitioner had submitted forged documents); Efe v. Ashcroft, 293 F.3d 899, 902 n.1, 908 (5th Cir. 2002) (upholding a finding of frivolousness where dental records conclusively disproved a petitioner's claim about his age at the time of his entry to the United States); Barreto-Claro v. U.S. Att. Gen., 275 F.3d 1334, 1339 (11th Cir. 2001) (upholding a finding of frivolousness where a petitioner admitted to having lied in a first, related asylum application).

While we find Liu instructive, we find it unnecessary to adopt or approve any of the specific "emergent standards" for the application of Rule 208.20—all would be satisfied by the present facts. It is undisputed that the petitioner filed a false application, failed to modify that application when given the chance, swore to the truth of the application, lied in response to the IJ's questions, and subsequently admitted to the falsity of testimony and her application. Accordingly, there were fabrications. She was given "sufficient opportunity to account for any discrepancies or implausible aspects of [her] claim," before the IJ, but admitted rather than denied the falsity of her testimony regarding time spent in Eritrea.

The petitioner did present explanations regarding her state of mind. Also she described her false statements as side issues that did not bear directly on her claims for relief. As such, she appears to base her challenge on the deliberateness and materiality elements under Rule 208.20. Regarding deliberateness, we are constrained by the Board's finding as to credibility and the Board's rejection of the petitioner's claim that Mr. Abraha overbore her will. These findings were supported by substantial evidence. See Ignatova, 430 F.3d at 1214 (applying a substantial evidence standard to a finding of frivolousness by the Board). As such, we must reject the argument that the petitioner's state of mind made her fabrication something less than deliberate. Also, we agree with the Board that her false statements were material. Her claims regarding time spent in hiding in Eritrea and Ethiopia relate directly to the issue of past persecution and also to the issue of the likelihood of future persecution.

-13-

We affirm the Board and deny the petition for relief.

_____